IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DREW WHITLEY, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | NO.: 07-403 |
| | ) | |
| vs. | ) | |
| | ) | The Honorable Joy Flowers Conti |
| ALLEGHENY COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSIVE CONCISE COUNTERSTATEMENT OF MATERIAL FACTS (*OMITTING PARAGRAPHS 54 THROUGH 64 FILED SEPARATELY UNDER SEAL*)

Plaintiff, Drew Whitley ("Whitley"), by his attorneys, Lawrence H. Fisher, Esquire and Joseph E. Devine, Esquire, sets forth the following Concise Counter-Statement of Material Facts to the Concise Statement of Material Fact filed on behalf of Defendants, Allegheny County, Robert Lazzaro, Herb Foote, Lee Torbin, Robert Payne, Thomas M. Fitzgerald, and John Markel (collectively referred to herein as the "Defendants").

1. Admitted.

2. Admitted.

3-7. Admitted in part and denied in part. It is admitted that Defendants' recitation of portions of the February 10, 1989 affidavit of probable cause are substantially the same as corresponding statements contained in Defendants' Exhibits C. It is specifically denied that the affidavit established probable cause when viewed under the totality of the circumstances. To the contrary, the affidavit of probable cause omitted several material facts and items of evidence which would have precluded a finding of probable cause. *See* Plaintiff's Additional Material Facts Necessary For The Court To Determine Summary Judgment.

1

8-12. Admitted in part and denied in part. It is admitted that Defendants' recitation of portions of the August 18, 1988 affidavit for search warrant are substantially the same as corresponding statements contained in Defendants' Exhibit "A." It is specifically denied that the affidavit for a search warrant established probable cause for the arrest of Drew Whitley when viewed under the totality of the circumstances. To the contrary, no evidence was recovered as a result of the search warrant that would otherwise indicate that Plaintiff had anything to do with the murder. By way of further answer, Defendant Lazzaro admitted that there was no physical evidence that tied Whitley to the crime. Pl. Ex. J-77. Moreover, Drew Whitley consented to said search and fully cooperated with the investigation obviating any materiality for probable cause purposed. Pl. Ex. D-8 through D-9A. *See also* Plaintiff's Additional Material Facts Necessary For The Court To Determine Summary Judgment.

13. Admitted in part and denied in part. It is admitted that Defendants' recitation of portions of the August 18, 1988 affidavit for search warrant are substantially the same as corresponding statements contained in Defendants' Exhibit "A." Defendant's Exhibit "B" does not refer to "Jerome Wilson" and instead refers only to an "individual." To the extent the Defendants imply that the excerpts from Exhibit "A" and/or Exhibit "B" as contained in Paragraph 13 of their Concise Statement established probable cause to arrest Drew Whitley, the same is specifically denied. To the contrary, no evidence was recovered as a result of the search warrant that would otherwise indicate that Plaintiff had anything to do with the murder. By way of further answer, Defendant Lazzaro admitted that there was no physical evidence that tied Whitley to the crime. Pl. Ex. J-77. Moreover, Drew Whitley consented to said search and fully cooperated with the investigation obviating any materiality for probable cause purposed. Pl. Ex.

D-8 through D-9A. *See also* Plaintiff's Additional Material Facts Necessary For The Court To Determine Summary Judgment.

14. Denied. In no portion of Defendants' Exhibit "A" does it state that the witness "recognized Drew Whitley by sight and by sound of Whitley's voice" as stated in Paragraph 14 of Defendants' Concise Statement. Defendants' Exhibit "A" states only that Wilson allegedly "recognized" Plaintiff. *See* Defendants' Exhibit "A." *See also* Plaintiff's Additional Material Facts Necessary For The Court To Determine Summary Judgment.

15. Admitted in part and denied in part. *See* paragraphs 8-12 above.

16. *See* Plaintiff's response in Paragraph 8. Defendants' averments as contained in Paragraph 16 of their Concise Statement are essentially identical to those contained in Paragraph 8 of their Concise Statement and make reference to the very same exhibit, Exhibit "A."

17-21. *See* Plaintiff's responses in Paragraph 9-13. Defendants' averments as contained in Paragraphs 17-21 of their Concise Statement are identical to those contained in Paragraph 9-13 of their Concise Statement and make reference to the very same exhibit, Exhibit "A."

22-23. Admitted in part and denied in part. *See* paragraphs 8-12 and 15 above.

24. *See* Plaintiff's response in Paragraph 3. Defendants' averments as contained in Paragraph 24 of their Concise Statement are almost identical to those contained in Paragraph 3 of their Concise Statement and make reference to the very same exhibit, Exhibit "C."

25-28. Admitted in part and denied in part. It is admitted that Defendants' recitation of portions of the February 10, 1989 affidavit of probable cause are substantially the same as corresponding statements contained in Defendants' Exhibits D. To the extent the Defendants imply that the excerpts as contained in Paragraph 25 of their Concise Statement established probable cause to arrest Drew Whitley, the same is specifically denied. To the contrary, the

affidavit of probable cause omitted numerous material facts and items of evidence which would have precluded a finding of probable cause. *See* Plaintiff's Additional Material Facts Necessary For The Court To Determine Summary Judgment.

29 -30. Admitted in part and denied in part. The transcript of the coroner's inquest speaks for itself. To the extent that Defendants claim that the coroner's inquest has any applicability in determining whether there was probable cause to arrest Drew Whitley, the same is specifically denied. To the contrary, the affidavit of probable cause omitted numerous material facts and items of evidence which would have precluded a finding of probable cause. *See* Plaintiff's Additional Material Facts Necessary For The Court To Determine Summary Judgment.

31. Paragraph 31 of Defendants' Concise Statement is not material for purposes of Summary Judgment.

### **ADDITIONAL MATERIAL FACTS NECESSARY FOR THE COURT TO DETERMINE THE MOTION FOR SUMMARY JUDGMENT(*OMITTING PARAGRAPHS 54 THROUGH 64 FILED SEPARATELY UNDER SEAL*)**

1. This case originates in the early morning hours of August 17, 1988, when 22 year old Noreen Malloy was heinously murdered in the parking lot of the McDonald's located in West Mifflin, PA near Kennywood Park. *See* Pl. Ex. A-1 through A-23.

2. Defendant-detectives Lazzaro and Foote were the designated "initial detectives" a term which is synonymous with being the lead detectives assigned to the case. Pl. Ex.s A-1, J-6, K-2 through K-3. Defendant-detectives Fitzgerlad, Payne, Torbin and Markel reported to the crime scene and assisted in the interview of witnesses and collection of evidence throughout the investigation. Pl. Ex. A-1. Lazzaro and Foote remained the lead detectives throughout the course of the ensuing investigation. Pl. Ex.s J-6, K-2 through K-3. Throughout the investigation as lead

4

detectives, Lazzaro and Foote were aware of all activities undertaken by every detective working on the case. Pl. Ex. J-8, J-15. Unless a lead detective took the initiative to ask one of the other detectives working the case to perform further work, the other officers would have no further participation. Pl. Ex.s N-6, O-2 through O-11.

3. The Malloy murder investigation occurred over a course of 6 months, the entire time of which, Whitley was incarcerated on unrelated parole violations. *See* Pl. Ex. A-1, D-15; Def. Ex. C and D.

4. Witnesses to the murder were McDonald's employees Bill Weinberg, Shawn Divan, Karen Queenan, Barbara Rice, Thomas Pitts, Shelley Slater and Jerome Wilson. Plaintiff's Exhibit A-6, A-12, A-14. The only other individuals in the area were James Queenan – who was waiting in a car in the parking lot for his daughter, Karen, to get off of work – and an unknown assailant (the "assailant") who committed the murder. Plaintiff's Exhibit A-8, A-13, A-16.

5. None of the witnesses were initially able to identify the assailant beyond generalities. All of the witnesses at the scene were in general agreement that the assailant was tall – 6' to 6'3" – thin, black and male. Pl. Ex. A-6, A-9, A-10, A-20, B-2.

6. The assailant was also described as wearing a dark stocking mask over his face along with a beige trench coat, tan hat with a brim that went all the way around, dark pants and white tennis shoes. Pl. Ex. A-6, A-9, A-10, A-20, B-2.

7. Witness Shawn Divan stated that the assailant's voice "sounded young" Pl. Ex. A-9. Likewise, Witness Thomas Pitts described the assailant as being approximately 19 to 21 years in age. Pl. Ex. A-15.

8. Witness Jerome Wilson was first interviewed by Defendants Fitzgerald and Payne at 4:10 a.m., on the morning of the murder. Pl. Ex. B-1. In his first interview, Wilson could not identify the assailant, and was only able to confirm the general description of the assailant as a tall, thin, black male wearing a tan hat, trench coat and white tennis shoes. Pl. Ex. B-2.

9. During the struggle with the victim, Wilson also claimed to have observed the assailant grab Malloy from behind, "putting his right arm around her neck and holding the gun in his left hand and pointed it towards her head." Pl. Ex. B-2.

10. Wilson confirmed that the assailant was wearing dark pantyhose stocking over his face that was pulled down past the neck. Pl. Ex. B-2.

11. Wilson stated that he was only able to ascertain that the assailant was black due to the fact that he did not wear gloves, thus leaving his hands and forearms exposed. Pl. Ex. B-2.

12. Wilson described the voice of the assailant as sounding like a "young person," an observation which was also confirmed by Shawn Divan and Thomas Pitts. Pl. Ex. A-9, A-15, and B-2.

13. At no time during his first interview with detectives investigating the murder of Noreen Malloy was Wilson able to identify the assailant as Whitley. Pl. Ex. B-1 through B-3.

14. The next day, on August 18, 1988 Defendants Lazzaro and Foote interviewed Gary Covington, a resident of the Mon View Heights Housing Projects, who reportedly had information regarding the identity of the assailant in Malloy's murder. Pl. Ex. B-4 through B-5. Covington stated that he had a conversation with Jerome Wilson, subsequent to the shooting, wherein Wilson stated that he "thinks it was Drew from up the street." Pl. Ex. B-5.

15. Defendants Fitzgerald and Payne re-interviewed Wilson shortly after Covington's statement on the morning of August 18, 1988. Pl. Ex. B-6. During this second interview, Wilson

re-iterated the story he told the day of the murder, including the fact that the assailant grabbed and held Malloy with his right arm and held the gun with his left hand. Pl. Ex. B-7.

16. After he was pressed to "tell the truth," Wilson recanted his previous statements and identified Whitley as the assailant. Pl. Ex. B-8. Wilson claimed that he was able to identify Whitley because of his facial structure that he was somehow able to discern through the dark stocking mask during the nighttime. Pl. Ex. B-8. The external lights located in the parking lot of where Malloy was murdered were turned off at 12:00 a.m. Pl. Ex. A-5. The murder occurred at approximately 2:45 a.m. Pl. Ex. A-10.

17. Although he first claimed that the assailant sounded like a "young person," Wilson stated in the second interview that he was able to identify Whitley upon hearing the voice of the assailant. Pl. Ex. B-2, B-9. Whitley was 32 years old at the time of the murder. Pl. Ex. D-15.

18. Wilson also told Defendants that the last time he had seen Whitley was a month prior to the murder. Pl. Ex. B-10.

19. Wilson stated to Defendants that he had told Covington that he "thought it was [Whitley]," and that Covington responded by saying it sounded like something Whitley would do. Pl. Ex. B-10.

20. It has never been alleged that Wilson was known to police and/or had a history of providing reliable information. *See* Pl. Ex. B-1 through B-3, B-6 through B-10. Wilson's reliability was severely undermined by the fact that he gave a contradicted statement to investigators regarding the identification of Whitley as Malloy's assailant a day after Wilson's initial interview where he was unable to identify Whitley as Malloy's assailant. *See* Pl. Ex. B-1 through B-3, B-6 through B-10. When interviewed right after the murder, none of the 8 witness

7

to the murder provided any statements which described any discernable facial features of Malloy's assailant on account of the dark stocking mask and the facial area of the assailant appeared "all black." Pl. Ex. A-9. The only consistent aspect of Wilson's two statements was his observation that the assailant used his right arm to hold Malloy while using his left hand to point the gun. Pl. Ex. B-2, B-7. Every other witness to the murder who offered an observation about the positioning of the assailant's arms and hands, stated that the assailant used his left arm to hold Malloy and held the gun in his right hand. Pl. Ex. A-6, A-9, A-14, A-19

21. Although investigators had 6 months in which to consider the reliability of Wilson's varied and contradictory statements, such contradictions were omitted from the February 10, 1988 affidavit of probable cause, as well as all the other contradictions from numerous additional witnesses to the murder, and a panoply of exculpatory evidence which exonerated Whitley in Malloy's murder. *See* Def. Ex. C and D, Pl. Ex. B-1 through B-3, B-6 through B-10.

22. During his deposition, Defendant Lazzaro, admitted that there was no physical evidence that tied Whitley to the murder of Noreen Malloy. Pl. Ex. J-77.

23. Two latent fingerprints suspected to be the assailant's were recovered from the scene of Malloy's murder and did not match Whitley's fingerprints. Pl. Ex. E-28.

24. The hat worn by the assailant was non-adjustable and was measured to be 22 1/8 inches in circumference. Pl. Ex. E-32. Whitley's head was measured by police and determined to be 23 inches. Pl. Ex. D-64. Witnesses observed the hat come off the head of the assailant during his flight from the scene. Pl. Ex. A-2, A-6.

25. Shoeprints taken from the scene and analyzed, did not match Whitley's shoes. Pl. Ex. J-76.

26. Investigators discovered Newport cigarette butts in the stairwell at the scene, whereas Whitley did not smoke Newport cigarettes. Pl. Ex. E-13, E-29 and E-38.

27. Dried blood was observed under Malloy's fingernails resulting from her struggle with the assailant. Pl. Ex. E-32. Whitley voluntarily provided a litany of genetic samples to police, but Defendants did not test the dried blood from Malloy's fingernails against that of Whitley or anyone else. Pl. Ex. E-67 through E-73, E-75 through E-76. Although Malloy was uniformly described as having struggled with the assailant, and as having blood under her fingernails, a physical examination of Whitley on the day after the murder did not reveal any scratches or markings of a struggle. Pl. Ex. E-65, E-66.

28. Defendants misused Gary Starr, a convicted murderer on death row, to insure that Whitley was wrongfully convicted of Malloy's murder. *See* Pl. Ex. I-1 through I-28. Two days before the issuance of the arrest warrant for Whitley, Starr told authorities that Whitley provided him with a confession while the two were temporarily housed in adjacent cells. Pl. Ex. I-1 through I-5, I-7 through I-12. In misusing this so-called "confession" against Whitley, the Defendants disregarded the fact that Starr came forward with his allegations 6 months after he and Whitley had been housed in adjacent cells, and only after Starr had been sentenced to death. Pl. Ex. I-2 through I-5.

29. The Defendants ignored statements by Whitley's actual cellmate, Kenneth Willmer, who stated that Whitley always maintained his innocence. Pl. Ex. I-6. Willmer and Whitley were cellmates for approximately ninety (90) days, while Starr was housed in a cell adjacent to Whitley for only five (5) days. Pl. Ex. I-7 through I-12.

30. Months after Starr came forward with Whitley's supposed confession, Starr suddenly announced that two individuals, Bob Bricker and Arty Gorley, would say that Starr was

9

lying about said "confession." Pl. Ex. I-13 through I-20.  In response, the Defendants failed to interview either Bricker or Gorley to determine if Starr was being untruthful. Pl. Ex. K-38 through K-39.  Defendant Foote candidly admitted that such an investigation of evidence that impeached Starr's credibility should have been undertaken. Pl. Ex. K-38 through K-39.  This impeachment evidence was concealed from Whitley for purposes of trial. Trial Transcript at pp. 882-891.

31.     In his interview, Starr stated that Whitley had allegedly thrown the gun over a hillside across the street from McDonald's. Pl. Ex. I-4 through I-5.  In direct response to Starr's statements, the Defendants scoured a hillside at the end of Inland Avenue in April, 1989, a full 8 months after the murder and with negative results. Pl. Ex. I-21.  At least 9 detectives took part in the April, 1989 search of the hillside. Pl. Ex. I-21.

32.     Defendants investigated Starr's allegations regarding the whereabouts of the murder weapon 8 months after the murder, but totally ignored 7 other reports that an individual was searching for such a weapon only days after the murder. Pl. Ex. I-21, F-1 through F-10.

33.     Defendants undertook no such search in August of 1988, almost immediately after the murder, when they received reports from at least 7 local residents that a suspicious individual fitting the description of the killer was searching the hedges along Inland Avenue, a street which encompassed at least part of the assailant's route of flight. Pl. Ex. F-1 through F-10, Pl. Ex. I-21. The Defendants were first notified on August 21, 1988 that the suspicious actor was seen on Inland Avenue by two teenagers, Dan Ragan and Brian Sliva. Pl. Ex. F-2 through F-4.  The teenagers stated that the individual appeared to be "looking for something." Pl. Ex. F-2 through F-4.  Thereafter, on August 22, 1988, Inland Avenue residents Bill Ridinger, Keith Werthear, John Lieustis, Perl Beres and Patrick Bouton all "converged" on an officer from another

jurisdiction conducting a cursory search for the murder weapon on Inland Avenue. Pl. Ex. F-5. All of these residents related similar observations to that of Ragan and Sliva. Pl. Ex. F-5. Resident Bouton told police that he was concerned that the individual was "searching for the weapon used in the murder." Pl. Ex. F-8. Resident Bouton described the individual as a tall (6'-6'3"), black male who appeared to be in his early 20's. Pl. Ex. F-8. The residents provided a description of the suspicious actor's blue jeep, which residents observed driving toward the Mon View Heights Housing Project after becoming conscientious of onlookers. Pl. Ex. F-1 through F-10, Exhibit J-48 through J-51.

34. Although all 7 residents generally reported consistent observations of the suspicious individual who was seen "searching" Inland Avenue at different times after the murder, the Defendants exhibited a conscious disregard by failing to show these residents any photos of Whitley, or two other men who should have been prime suspects – Kevin Tench and Nathan Meador (discussed *infra*). Pl. Ex. F-1 through F-10, J-49. When questioned as to why he did not request that the 7 residents participate in a standup, Defendant Torbin affirmed that part of the reason was on account of the fact that Whitley was already in custody. Pl. Ex. L-37.

35. Defendants concealed a plea bargain that existed between Starr and the government, essentially falsifying Starr's testimony against Whitley. Pl. Ex. I-23 through I-28. The plea bargain by which Starr offered testimony against Whitley in exchange for reducing Starr's death sentence to life imprisonment was concealed from Whitley. *See* Trial Transcript at p. 881. When asked during trial if Starr had been offered any such inducement for his testimony against Whitley, Starr denied the same. Trial Transcript at p. 881. After commencement of the instant litigation, undersigned counsel has discovered evidence that such a deal existed. Pl. Ex. I-23 through I-28.

36. In their efforts to gather information from Kevin Tench for purposes of implicating Whitley in the murder, the Defendants conducted an interview with Nicole Bufkin, Tench's live-in girlfriend, on November 18, 1988. Pl. Ex. H-1. During this interview, Bufkin informed the Defendants that Tench had been incarcerated since August 24, 1988. Pl. Ex. H-1. Bufkin also stated that Tench and Whitley were friends and that Whitley had been to their apartment in the past. Pl. Ex. H-1 through H-2. Bufkin informed the Defendants that a week prior to the interview, she had visited Tench in prison where he told her that Whitley had committed the murder. Pl. Ex. H-1.

37. Four days after her initial interview, Bufkin was shown a photo array and was asked to pick out Whitley, which she did successfully. Pl. Ex. H-5, H-7. By contrast, none of the 8 witnesses to the murder, and none of the 7 residents who observed the suspicious individual on Inland Avenue, were ever asked to partake in a photo array, lineup or voice identification procedure. Pl. Ex. F-1 through F-10, J-49 through J-51, L-30, L-32 through L-34.

38. On November 21, 1988, the Defendants interviewed Tench. Pl. Ex. H-4. Tench stated that he did not have information pertaining to the murder and that he did not know Whitley by name. Pl. Ex. H-4. Subsequently, Tench submitted to a polygraph examination. Pl. Ex. H-7 through H-9, H-12 through H-14. Tench failed the test with respect to several questions and was determined to be untruthful. Pl. Ex. H-7, H-13 through H-14. In particular, the polygraph demonstrated that Tench was untruthful with respect to being in the area of Kennywood Park at the time of Malloy's murder, knowing who killed Malloy, and knowing Whitley. Pl. Ex. H-7, H-13 through H-14. Although Whitley requested a lie detector test to prove his innocence, he was never given such an opportunity. *See* Plaintiff's Complaint at ¶¶ 17(c), 34(c).

39. The reason why Tench failed the polygraph became evident after Defendants Lazzaro and Foote interviewed Barry Mayes on December 23, 1988. Pl. Ex. H-10. Mayes had visited his mother in Mon View Heights, around the time of the murder, and reported seeing Tench about an hour before the murder, walking toward Kennywood Park. Pl. Ex. H-10 through H-11. Mayes knew Tench from a previous interaction in which Tench stole a carton of Newport cigarettes from a beer store by placing the cigarettes in his trench coat. Pl. Ex. H-10 through H-11. Mayes briefly stopped and said hello to Tench. Pl. Ex. H-11. Mayes told investigating officers that he took note of the fact that Tench was wearing a beige trench coat such as the one worn by the assailant that murdered Malloy. Pl. Ex. H-11. Mayes thought it odd that Tench was wearing the trench coat as it was warm out and asked Tench if he was "going to steal more cigarettes." Pl. Ex. H-11. Mayes also provided information that one of Tench's friends owned a .25 caliber weapon just like the caliber of weapon used to kill Malloy. Pl. Ex. H-11. Mayes described Tench as 5'9", thin and having brown skin. Pl. Ex. H-11. In addition, supplemental reports indicate that at the time of the murder, Tench was 21 years old. Pl. Ex. H-4.

40. The Defendants' only effort to justify their failure to follow up with an investigation of Tench concerned the fact that Tench was 5'9." Pl. Ex. J-87. In his deposition more than 20 years after the murder, Lazzaro described Tench as being 5'2," but a report contained in the investigative file from 1988 states that Tench was 5'9." Pl. Ex. H-11, J-87.

41. The Defendants deliberately chose not to investigate Nathan Meador in the murder of Noreen Malloy, though 20 years later Defendant Lazzaro realized that he should have further investigated Meador in this regard. Pl. Ex. J-86 through J-87.

42. On August 19, 1988, at 5:40 p.m., two days after the murder, police received a report from a concerned citizen, Ki Mihaly, implicating Nathan Meador in the murder. Pl. Ex. G-

13

1. On the night of the murder, Mihaly, a food services manager at Three Rivers Stadium, was returning home after dropping off some of his younger employees in the Braddock/Duquesne area following a baseball game at the stadium. Pl. Ex. G-1. Unaware of the murder at that time, Mihaly took note of the police activity as he drove past the McDonald's and proceeded toward the Rankin Bridge located approximately two (2) miles past the murder scene. Pl. Ex. G-1, K-28. As Mihaly made the turn to go onto the Rankin Bridge, he noticed a hitchhiker described as a black male approximately "6'1" tall, thin, late teens, perhaps early 20's, pretty dark skinned[.]" Pl. Ex. G-1 through G-2. Mihaly told police that at approximately 3:00 to 3:15 a.m., he picked up the hitchhiker in his truck. Pl. Ex. G-1. After the individual got into his vehicle, Mihaly introduced himself and shook the man's hand. Pl. Ex. G-1. Mihaly told police that when he shook the man's hand, he noticed that the man was "sweaty, very clammy." Pl. Ex. G-1. In addition, Mihaly also took note of the man's general appearance as sweaty "as if from jogging or from being scared." Pl. Ex. G-1. Striking up a conversation, Mihaly asked if the man was coming from, "the park (Kennywood)?" To which, the man answered 'Oh, Yeh [sic], the park.'" Pl. Ex. G-1. Mihaly told the police that the "answer did not strike him as being truthful." Pl. Ex. G-1.

43. In the course of the interview Mihaly informed police that, as a food services manager, he was shorthanded and was always looking for new employees. Pl. Ex. G-1. Mihaly handed the hitchhiker a gold colored business card case and told the man to take one of his cards if he was interested in future employment. Pl. Ex. G-1 through G-2. Taking the case from Mihaly, the individual asked to be dropped off in Forest Hills. Pl. Ex. G-2. Following up on the offer for employment, the individual later called Mihaly at approximately 1:30 p.m. on August 19, 1988 and identified himself as Nathan Meador. Pl. Ex. G-2. Mihaly thereafter contacted the

14

police later on in the same day (August 19, 1988) and turned over to police the card case which the hitchhiker had held in order to be tested for fingerprinting. Pl. Ex. G-2, G-4 through G-5.

44. Mihaly's version of events was supported by an August 17, 1988 statement provided by Stephen Kovacich, a gas station attendant working in early morning hours following the murder. Pl. Ex. G-3. Kovacich worked at Bob's Autotorium and Gas Station which was adjacent to the south end of the Rankin Bridge. Pl. Ex. G-3. At approximately 3:30 a.m., Kovacich reported seeing a black male, approximately 18 years of age, 140 pounds with a thin build sitting on a step belonging to the gas station. Pl. Ex. G-3. Kovacich stated that the individual claimed to be waiting for a ride and that Kovacich told him to leave. Pl. Ex. G-3. A short while later, he noticed that the individual was no longer there. Pl. Ex. G-3.

45. On September 1, 1988, the Defendants interviewed Meador, who had since started working for Mihaly. Pl. Ex. G-6. Contrary to Mihaly's statements, Meador repeatedly denied being in the area at the time of the murder and stated that he did not hitchhike. Pl. Ex. G-6 through G-8. During the interview Meador acknowledged that he had previously stayed in the vicinity of the murder, with his mother, at 7B Midway Drive in the Mon View Housing Projects. Pl. Ex. G-6 through G-7. Meador did not drive and relied on the bus as an alternative means of getting between the two addresses. Pl. Ex. G-7. Meador told the Defendants that on the morning of the murder he stayed with his girlfriend at her residence in Wilkinsburg. He also stated that in the early morning hours of August 17, 1988 he was riding with his girlfriend who had been pulled over and had her car impounded by the Swissvale Police. Pl. Ex. G-7. Meador stated that his girlfriend's uncle, Earnest Bowden, picked them up at the police station and dropped them off at the Wilkinsburg residence at approximately 2:00 a.m. Pl. Ex. G-7. Meador claimed that he

15

got the card from Mihaly two days later, on August 19, 1988, after Mihaly approached him in Wilkinsburg. Pl. Ex. G-7.

46. Defendants conducted a second interview with Mihaly on September 2, 1988, wherein Mihaly refuted Meador's statements. Pl. Ex. G-11 through G-12. When asked about Meador's version of how he received his card, Mihaly stated that it was a "lie;" in that Mihaly had not been in Wilkinsburg all year, had given only one card out in the past couple weeks and that he was working a baseball game the late morning/early afternoon of August 19, 1988. Pl. Ex. G-11 through G-12.

47. Meador's version of events was also refuted by Earnest Bowden, the uncle of his girlfriend, who had picked up Meador and his girlfriend, a couple of hours before the murder at the Swissvale Police Department. Pl. Ex. G-13 through G-14. Bowden claimed that they drove from Swissvale to Midway Drive in the Mon View Housing Projects just prior to the murder, between 2:00 a.m. and 2:30 a.m., whereupon Meador entered the residence of Meador's mother in order to explain their lateness. Pl. Ex. G-13 through G-14. Bowden alleged that he waited for an hour to an hour and a half, during which time he heard an argument from inside. Pl. Ex. G-14. Bowden stated that he then drove his niece home to her Wilkinsburg address and left Meador at the Midway Road address. Pl. Ex. G-14. Bowden's statement directly conflicts with Meador's claim that he had been dropped off in Wilkinsburg at approximately 2:00 a.m. where he alledly stayed for the remainder of the evening. Pl. Ex. G-7, G-14.

48. Meador was never asked to take a polygraph examination, never made part of a lineup, nor was his photo shown to any witnesses in a photo array. Pl. Ex. K-29 through K-30, K-33. The latent fingerprint lifted from Mihaly's card case was never compared to either Meador, or Tench, or the prints taken from the scene of the crime, though Defendant Foote

16

candidly admitted that they should have been. Pl. Ex. J-27, J-37, K-47. In fact, the only print compared to that from Mihaly's card case was that of Whitley, which proved negative. Pl. Ex. E-116 through E-118.

49. When asked as to why no further investigation was performed with respect to Meador, Defendant Lazzaro claimed in his deposition that "I recall at the time, we had him alibied" and that "I just assumed that we thought we had him alibied, and I just don't know what else happened to him." Pl. Ex. J-37, *See also* J-27, J-61. In his deposition, Defendant Lazzaro also admits that more should have been done with respect to investigating Meador:

> Q: In retrospect, don't you think that you should have further investigated Mr. Meador?
>
> A: I guess, clearly, at the time I guess – what happened at the time, we just – he had an alibi. We just stopped there. We probably could have looked at him a little further, yes."

Pl. Ex. J-86 through J-87.

50. Defendants recovered .25 caliber shells from the murder weapon. Pl. Ex. E-13. Although they received a ballistics report indicating an imperfect firing pin impression, the Defendants consciously disregarded knowledge that another potential suspect, Gary Covington, had purchased a .25 caliber gun with a defective firing mechanism in the past. Pl. Ex. C-1 through C-3, J-59 through J-60. At the time of the shooting, the assailant had to manually eject the casing from the semi-automatic handgun a trait which is consistent with the gun sold to Covington. Def. Ex. C and D; Pl. Ex. C-1 through C-3. The Defendants did not follow up in any way as to the whereabouts of Covington's defective gun. Pl. Ex. J-60. Covington and the Defendants' primary witness, Jerome Wilson, were good friends and had spoken about the murder before Wilson suddenly contradicted himself and identified Whitley as Malloy's

murderer – a statement which served as the only basis for the affidavit of probable cause in this matter as discussed *supra*. Pl. Ex. B-4 through B-5, B-10.

51. Defendants ignored an alibi provided by Whitley's mother, Hati Whitley, and Whitley's estranged wife, Barbara Brown. Pl. Ex. D-83 through D-84.

52. Whitley's mother told Defendants that Whitley had observed Brown in Mon View Heights on the evening of the murder at approximately 2:30 a.m., as she was returning home from a local bar. Pl. Ex. D-83. Whitley also told his mother that he observed Brown with an alcoholic beverage at this time. Pl. Ex. D-83.

53. Brown confirmed that she left the bar at approximately 2:15 and that she walked to a friend's home in Mon View Heights with a group of friends. Pl. Ex. D-84. Brown told police that she arrived at a friend's house at approximately 2:30 a.m. to 2:45 a.m., and stated that one of the friends was carrying a beer. Pl. Ex. D-84.

54 – 64. *These paragraphs of this document are filed under seal.*

65. Whitley was ultimately exonerated in 2006 only after DNA evidence, which had previously been unavailable to him, conclusively established that he did not commit the murder of Malloy. Pl. Ex. Q-1 through Q-8.

66. Whitley's criminal case concluded with the filing of the Commonwealth's Petition For Nolle Prosse and Order of Court granting the same on May 1, 2006. Pl. Ex. Q-5.

67. Notwithstanding the overwhelming evidence of Whitley's innocence, and the fact that he has been exonerated, to this day the Defendants still insist that Whitley murdered Noreen Malloy. Pl. Ex. J-82, K-44, N-26 through 28.

68. The investigation of Noreen Malloy's murder has been re-opened and is currently ongoing. Pl. Ex. R-1 through R-9. Said investigation, however, flouts the instant litigation in a

continuing affront to justice and refuses to further investigate Kevin Tench and Nathan Meador. Pl. Ex. R-1 through R-9.

Date: August 17, 2009

Respectfully submitted,

BY: /s/ Lawrence H. Fisher, Esq.
    COHEN AND WILLWERTH, P.C.
    One Oxford Centre
    301 Grant Street, Suite 4300
    Pittsburgh, PA 15219
    Phone: (412) 894-8741
    lawfirst@comcast.net

BY: /s/ Joseph E. Devine, Esq.
    COHEN AND WILLWERTH, P.C.
    One Oxford Centre
    301 Grant Street, Suite 4300
    Pittsburgh, PA 15219
    Phone: (412) 482-4188
    joe@cohenwillwerth.com