IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DREW WHITLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-403 |
| | ) | |
| ALLEGHENY COUNTY; | ) | |
| THOMAS M. FITZGERALD, individually | ) | |
| as a detective for Allegheny County; | ) | |
| ROBERT LAZARRO, individually and as a | ) | |
| detective for Allegheny County; HERB FOOTE, | ) | |
| individually and as a detective for | ) | |
| Allegheny county; LEE TORBIN, individually | ) | |
| and as a detective for Allegheny County; | ) | |
| JOHN MARKLE, individually  and as a detective | ) | |
| for Allegheny County; ROBERT PAYNE, | ) | |
| individually and as a detective for Allegheny | ) | |
| County and SANFORD A. MIDDLEMAN, Esq., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION</u>**

CONTI, District Judge,

### *Introduction*

Pending before this court is a motion for summary judgment (Docket No. 67) filed by

defendants Allegheny County, Robert Payne ("Payne"), Thomas M. Fitzgerald ("Fitzgerald"),

Robert Lazarro ("Lazarro"), Herb Foote ("Foote"), Lee Torbin ("Torbin"), and John Markle

("Markle," together with Payne, Fitzgerald, Lazarro, Foote, and Torbin, "individual defendants,"

and individual defendants together with Allegheny County, "defendants"), seeking summary

judgment in their favor with respect to all the claims asserted by Drew Whitley ("Whitley" or

"plaintiff").  Whitley in the complaint filed in this case alleged defendants violated his civil

rights and asserted claims against defendants (1) under 42 U.S.C. § 1983 (count I) for deprivation of liberty without due process of law, malicious prosecution, and denial of the right to a fair trial, (2) under state law for malicious prosecution (count II), and (3) for professional negligence (count III) against Sanford A. Middleman.  On March 24, 2009, the court granted summary judgment with respect to count III (Docket No. 46).  For the reasons that follow, the court will grant the motion for summary judgment with respect to the claims at count I and count II.

### Background

On March 26, 2007, plaintiff commenced this lawsuit.  (Compl. (Docket No. 1).)  Plaintiff's claims arise from plaintiff's alleged unlawful conviction and incarceration for the August 17, 1988 murder of Noreen Malloy ("Malloy").  On May 1, 2006, plaintiff was exonerated of the murder by the Allegheny County Court of Common Pleas.  (Pl.'s Responsive Concise Counterstatement of Material Facts (Docket No. 79) ("Pl.'s facts") ¶¶ 65-66.)

On August 17, 1988, at approximately 2:30 a.m., Noreen Malloy ("Malloy") finished her shift as manager at the McDonald's restaurant located at 101 Hoffman Boulevard, Duquesne, Pennsylvania.  (Defs.' Concise Statement of Material Facts (Docket No. 69) ("Defs.' facts") ¶¶ 2, 3; Pl.'s facts ¶ 1.)  A black male accosted Malloy in the parking lot of the restaurant.  (Defs.' facts ¶ 4.)  This individual was described as 6'0" to 6'3" with a thin build.  (Id.; Pl.'s facts ¶ 5.)  He was wearing a yellow or beige colored trench coat with a belt secured around the waist, a stocking mask, a white or beige hat with a brim all the way around the hat, dark pants, and white tennis shoes.  (Defs.' facts ¶ 4; Pl.'s facts ¶ 6.)  The attacker had a small handgun in his right hand, and grabbed Malloy around her neck with one arm while he pointed the gun to her head

with the other arm.  (Defs.' facts ¶ 4.)  He demanded, "Give me the bag. Give me the bag."  (Id.) Malloy responded that she did not have any bag, and the actor responded that he would shoot her if she did not turn over the bag.  Malloy was able to escape the grasp of the actor, and he fired a shot into the air.  The actor then pulled back on the top of the pistol, which ejected a shell casing. The casing was recovered from the scene.  It was a .25 caliber casing, which indicates that actor possessed a .25 caliber semiautomatic pistol.  Malloy fled and while chasing her, the attacker fired a second shot.  This shot struck Malloy in her back, which ultimately caused her death. After shooting Malloy, he grabbed her and struck her in the face with the handgun.  He grabbed a purse she was carrying and fled on foot across Hoffman Boulevard into the Kennywood Park parking lot.  (Id.)

The Duquesne Emergency Medical Squad arrived at the scene shortly after the shooting. Malloy was pronounced dead at the scene.  (Defs.' facts ¶ 3.)  At approximately 3:15 a.m. on August 17, 1988, the Allegheny County Police Homicide Division was requested to assist Duquesne Police in the investigation of the homicide.  (Id.)  Among others, Fitzgerald, Foote, Lazzaro, Markel, Payne, and Torbin, detectives for the Allegheny County Police, responded. (Pl.'s facts ¶ 2.)  Lazzaro and Foote were the lead detectives. (Id.)

A number of McDonald's employees who were working that night were interviewed. (Pl.'s facts ¶ 4-8.)  These employees included Bill Weinberg, Shawn Divan, Karen Queenan, Barbara Rice, Thomas Pitts, Shelley Slater, and Jerome Wilson ("Wilson").  (Pl.'s facts ¶ 4.) The only other individual in the area of the shooting was James Queenan, who was waiting in a car in the parking lot for his daughter to finish work.  That evening, no witness was able to identify the assailant beyond generalities.  (Id.)

Detectives Payne and Fitzgerald of the Allegheny County Police Homicide Division interviewed Wilson at approximately 4:10 a.m. on August 17, 1988.  (Pl.'s facts ¶ 8.)  During that interview, Wilson did not identify the shooter.  (Id.)  He stated that:

> he arrived early [for his 3 a.m. to 1 p.m. shift] and was told that he had to wait outside until the 3:00 A.M. shift supervisor came in. The subject stated that he went over to the corner of the restaurant and sat down on the curb.  The subject stated that while he was sitting there, people started to come out of the McDonald's which would have been the 2:00 A.M. shift quitting.  The subject stated that he heard something walking towards him from behind the building from where the staircase leads to McDonalds [sic] leading to the basement.  The subject stated that this black male placed a gun in his face and told him not to move.  The subject stated that he sat still while the black male then moved towards Noreen who was still at the door, shutting the door to McDonalds [sic].  The subject then stated that four other employees, one named Tom LNU, were at the driveway and standing in different areas in the parking lot when this happened.  The subject stated that Tom was standing there at the sign which says "McDonalds" and the others were standing in various areas of the parking lot getting into their vehicles.  The subject stated that as the suspect headed towards Noreen, he said to her "Give me the money bag."  She replied that she didn't have one.  The subject then stated "Give me your purse", [sic] which she had under her arm.  The subject stated that the suspect then grabbed her from behind, putting his right arm around her neck and holding the gun in his left hand and pointed it towards her head.  The subject stated that after a brief moment or so she broke loose and headed towards the cars which were parked directly from the door.  The suspect ran after the victim, chasing her towards the cars, grabbed her, and hit her in the face with the gun.  The victim falls and the suspect fires on shot in the air.  The suspect then walked over to the victim and fired one shot directly at her.  The subject stated that they all started to run at this time. The subject was asked how far the suspect was from the victim when he fired and the subject stated that he was less than a foot away from her when he fired a shot at her.  The suspect then took her purse and ran across the street into the opening between the weeds and the fence of the Kennywood parking lot, ran into the parking lot and down towards Kennywood Blvd. . . . The subject was asked if her could describe this black male and the subject stated that he was very thin built, had a tan hat like a fishing hat, panty hose stocking over his face, dark in color, trenchcoat (tan in color which came down past his knees), with white tennis shoes.

4

> The stocking cap was pulled down all the way down past the neck. The suspect had no gloves and the subject could see that the suspect was a black male because the of the hands and forearms which showed through.  The subject stated that the suspect had to be 6'2" or taller and that the weapon was an automatic because there were casings on the ground and it sounded like a .22 caliber.

(Pl.'s facts, Ex. B-1 to B-2.)  Other witnesses confirmed that the assailant's voice sounded young.  (Pl.'s facts ¶ 12.)  During this interview, Wilson did not identify the shooter as Whitley.  (Pl.'s facts ¶ 13.)

On August 18, 1988, detectives interviewed Gary Covington ("Covington"), who resided in the Mon View Heights Housing Projects.  (Id. ¶ 14.)  Covington reportedly had information with respect to the murder.  During the interview, Covington stated he had a conversation with Wilson, in which Wilson stated he "thinks [the murderer] was Drew from up the street."  (Id.)

Shortly after learning of Wilson's alleged statement from Covington, Fitzgerald and Payne interviewed Wilson a second time.  Wilson reiterated the his recollection of the events that occurred, including his observation that the assailant grabbed and held Malloy with his right arm and held the firearm with his left arm.  (Id. ¶ 15.)  The officers at this point pressed him for more information; Wilson was hesitant to provide more information, but eventually identified the assailant:

> At this point these dets. directly asked Mr. Wilson if he was able to recognize the actor who committed the murder in the McDonald's parking lot that morning.  At this question, Wilson became extremely nervous and somewhat evasive in his response.  These dets. explained to Wilson that in an investigation of this importance it is the duty of all citizens to come forward with pertinent information.  These dets. explained that an innocent girl had been killed and Wilson himself, could have been killed.  It was explained that with this type of act being committed, many people become concerned and many people have already been spoken to even in this short period of time.  Wilson was told he may not know all who these dets. have talked to and what information we have received, and he was told the only thing we are looking for is

the truth.  Based on these statements to Wilson, he explained his fears to us.  He stated he did in fact recognize the actor who committed the murder, and he was extremely frightened for the lives of himself and his family.  He explained that the individual he recognized who committed the murder and robbery lives in the same area he lives.  He stated he, himself, lives in a building in MonView [sic] Heights projects and the actor who committed the murder lives in the building directly in front of him.  Wilson stated he is married, his wife is pregnant and he is fearful if any information leaks out that he can identify this person, his wife's life and his would be threatened.  He stated the only reason he did not tell these dets. on the right of the incident that he recognized the individual was due to fear of being killed himself, or of his wife being killed.

At this point Wilson identified the actor as Drew Whitley who lives in Bldg. 19, MonView [sic] Heights projects.  The reason he identified him is because he recognized Whitley's facial features.  When asked to explain, Wilson stated he has been in Whitley's company on several occasions and knows him to speak to.  He stated Whitley has a unique facial structure, that being extremely long, almost to the point of being abnormal.  He stated Whitley is very tall and extremely thin due to his drug addict activities.  He stated he had the opportunity to see the actor at close range when first confronted by him when the gun was placed in his face.  Wilson stated he had been sitting down at the time he first heard the actor come up behind him, and as he turned he saw the actor point the gun at him, telling him not to move.  He stated he got a fairly good look at the actor's face even though the actor had on a stocking mask.  He stated that even with the mask on, he could detect the abnormality of the facial features, the extreme length of the face, the large flat nose that Whitley has and the heavy mustache which he could detect through the mask.  Wilson stated he saw the actor go over to the victim, place his arm around her and heard his voice as he gave commands.  Wilson stated he saw the actor go over to the victim, place his arm around her and heard his voice as he gave commands.  Wilson then stated he saw the victim run to the car, the actor chase her, beat her and at this time Wilson ran up Hoffman Rd. toward the Giant Eagle.  As he ran up the road, Wilson turned and observed the actor running directly behind him.  He saw the actor's entire face through the mask.  When this occurred, he was directly under the streetlight at the McDonald's entranceway off Hoffman Rd.  Wilson stated it was at this time he got a good look at the actor's face through the mask, along with the abnormal shape of the head through the mask and that, coupled with his initial confrontation with the actor, seeing his face, his tall extremely thin stature, hearing his voice

which he recognized, convinced him of the actor's identification. Wilson further stated he was well awarae [sic] of Whitley's reputation in the community as being a drug user, con-artist and troublemaker. Wilson stated Whitley is an individual he did not want to be around because of his reputation and he would try to avoid him. Wilson was asked how sure he was that the actor was Drew Whitley. Wilson stated he was certain the individual who committed the murder/robbery was Drew Whitley. Wilson elaborated on the fact he could recall the first time he met Whitley, he remembers saying to himself, "Wow, does this man have a big head and face." Again Wilson elaborated on the fact that when he talks about a big face, he means the individual has an extremely long face from the top of the forehead to the chin.

(Pl.'s facts, Ex. B-8 to B-9.) Wilson also explained what happened the night of the shooting after he was interviewed:

Wilson stted [sic] he went home at 6:00 AM because he was upset about what happened, and at this point the truck they were supposed to unload at 3:00 AM had been cancelled. Wilson stated he came back at 6:30 AM because he had received a call from the manager of McDonald's saying the police wanted to question him again. Wilson stated when he got there, the police were gone, so he continued to work and stayed until 5:00 PM. The truck they were supposed to unload came in about 2:30 PM. The subject stated when he got home, he told his wife what happened but did not tell her at this time he thought it was Drew. The subject stated he didn't want to worry her and get her involved, knowing that Drew lived in the building in front of them. The subject stated that about 8:30 PM he left the house and went down to Whitaker, and was talking to some friends and saw a friend of his, Gary Covington. Wilson said he was talking to a B/M named Billy, who he knows from hanging around Whitaker and he was telling him what had happened at McDonald's. Wilson said Gary overheard this speaking about McDonald's and asked him what happened. Wilson said he told them what happened, then told Gary he thought it was Drew. Wilson said he Gary told him it sounded like something Drew would do. Wilson was asked why he would speak to Gary about this, and he said he considers Gary like a big brother and he and Gary have always been close. Gary has always been his friend. Wilson was asked if he told anyone else about this and he said he had told no one he thought it was Drew but Gary. Wilson was asked when, prior to last evening, he had last seen Drew and he stated about a month ago. Subject stated he knows Drew as a junkie and thief and Drew always wears a hat. Subject

> stead [sic] he and Gary discussed the fact Drew always wears a
> hat, although he never saw that particular hat on Drew.  Wilson
> was asked what he was going to do with this information and he
> stated on this date he was going to his manager, Linda, tell her
> what his feelings were and what he should do.  Wilson could add
> nothing further and the interview was terminated.

(Pl.'s facts, Ex. B-9 to B-10.)  None of the eight other witnesses to the murder described any

discernible facial features of the shooter, because he was wearing a stocking mask.  (Pl.'s facts ¶

20.)  One other witness testified that the assailant's face "looked all black."  (Pl.'s facts, Ex. A-

9.)  Although Wilson was consistent in testifying that the assailant held Malloy with his right

arm and pointed his weapon at her with his left, all other witnesses observed the assailant use his

left arm to hold Malloy and use the right to hold the gun.  (Pl.'s facts ¶ 20.)

Covington owned a .25 caliber automatic handgun that was missing a pin.  (Pl.'s facts,

Ex. C-2.)  Two spent .25 caliber shells were found at the murder scene, but the "cartridge cases

found at the scene lack[ed] sufficient detail in the firing pin impression and breech face

impression for comparison purposes."  (Pl.'s facts ¶ 50; Pl.'s facts, Ex. C-3.)  At the time of the

shooting, the assailant manually ejected the casing from the semi-automatic handgun, which is a

trait consistent with the type of gun Covington owned.  Defendants did not follow up on the

whereabouts of Covington's gun.  Covington and Wilson were good friends.  Covington and

Wilson spoke about the murder shortly before Wilson identified Whitley as the murderer.  (Pl.'s

facts ¶ 50.)

In August 1988 within days of the murder, seven local residents reported that an

individual was searching hedges along Inland Avenue; Inland Avenue was a street that

encompassed at least a part of the route of the assailant's flight.  (Pl.'s facts ¶ 33.)  The

individual was described as a "suspicious black male" by at least two people, (Pl.'s facts, Ex. F-

1), and another reported that the person was "approx. early 20's, dark skinned, approx. 6'–6'3"

tall, thin build," (Pl.'s facts, Ex. F-8).  One resident specifically told a police officer that the individual was "searching for the weapon used in the murder."  (Pl.'s facts, Ex. F-8).  The residents who reported this incident were not shown photos of Whitley or any other suspect, and did not participate in a line-up procedure.  (Pl.'s facts ¶¶ 34, 37.)  Torbin admitted that he did not arrange a line-up because Whitley was already in custody.  (Id.)

On November 18, 1988, defendants interviewed Nicole Bufkin ("Bufkin"), the live-in girlfriend of Kevin Tench ("Tench").  (Pl.'s facts ¶ 36.)  Bufkin stated that Tench was incarcerated since August 24, 1988, and that Tench and Whitley were friends.  Bufkin stated that one week earlier, she visited Tench in prison and Tench explained that Whitley admitted to the murder.  (Id.)  Bufkin was shown a photograph array and successfully identified Whitley.  (Pl.'s facts ¶ 37.)

On November 21, 1988, defendants interviewed Tench.  Tench asserted that he did not have any information regarding the murder of Malloy, and he did not know Whitley by name. (Pl.'s facts ¶ 38.)  Tench was subjected to a polygraph examination; he failed with respect to several questions, including questions about whether he was in the area of Kennywood Park at the time of the murder, knew who killed Malloy, and knew Whitley.  (Id.)

On December 23, 1988, Lazzaro and Foote interviewed Bryan Mayes ("Mayes"). Around the time of the murder, Mayes visited his mother who resided in the Mon View Heights Housing Project.  Mayes reported seeing Tench about an hour before the murder walking toward Kennywood Park.  Mayes knew Tench previously stole Newport cigarettes from a beer store by placing the cigarettes in his trench coat, and described Tench's physical characteristics and clothing on the night of the murder:

> Mr. Mayes was asked how he knew Kevin Tench.  He stated that
> he knows Kevin to see him around and approx. one month before

the shooting Mayes stated that he jitnied Kevin and another individual known as "Booty" to Beer World in East Land Shopping Center.  When Kevin and Booty came out of Beer World for the ride back to Monview [sic] Heights Kevin had stolen three cartons of cigarettes ( two Kools, One [sic] Newport) and they were inside the trench coat Kevin was wearing.  Mayes told Kevin that he wasn't getting in the car with the stolen cigarettes and Mayes along with Booty drove off.  Mayes referred to Tench as the cigarette man.

Mayes was asked what Kevin was wearing when he seen him walking down Outlook Dr. He stated that Kevin was wearing a trench coat, beige in color, below the knees. Mayes stated that he and Kevin waived at each other and Mayes asked Kevin what he was doing wearing a trench coat, its warm out, are you going to steal more cigarettes. Kevin stated, "No man, you know how it is." Kevin was also wearing a pair of tennis shoes, no hat and he was eating something like candy or peanuts. Kevin was not carrying anything.

Mayes went on to say that he was told by Booty that a friend of Kevin's (name unknown) who lives in Mckeesport has a .25 automatic. Mayes was asked if he knew anyone who would know Kevins [sic] friend. He stated that Kevin had rapped [sic] a thirteen year old girl whose last name in [sic] Lewis and who lives in Monview Heights. It was supposedly reported to the West Mifflin Police. Mayes stated that the girl or her mother would know the friend in McKeesport.

Mayes was asked if ever seen [sic] Kevin and Drew Whitley together.  He stated that he hadn't. Mayes was asked to describe Kevin Tench. He stated that he was approx. 5'9", thin, brown skin.

(Pl.'s facts, Ex. H-10 to H-11.)  Tench was 21 years old at the time of the murder.  (Pl.'s facts ¶ 39.)  Defendants responded that they did not further investigate Tench because he was only 5'9". (Pl.'s facts ¶ 40.)

On the night of the murder, Ki Mihaly ("Mihaly"), a food services manager at Three Rivers Stadium, drove some of his younger workers to the Braddock and Duquesne neighborhoods after a baseball game.  Mihaly was not aware of the murder, but noted police activity as he drove past the McDonald's where Malloy was murdered.  Sometime between approximately 3:00 a.m. and 3:15 a.m., Mihaly picked up Nathan Meador ("Meador"), who was

hitchhiking, near the Rankin Bridge about two miles from the murder scene.  (Pl.'s facts ¶ 42.)

Mihaly described Meador as "about 6'1" tall, thin, late teens, perhaps early 20's, pretty dark

skinned, close cropped hair."  (Pl.'s facts, Ex. G-2.)  Mihaly shook Meador's hand, and believed

it was "sweaty; very clammy."  (Pl.'s facts, Ex. G-1.)  Mihaly thought Meador generally

appeared sweaty, "as if from jogging or from being scared."  (Id.)  Mihaly asked Meador if he

was coming from Kennywood, and Meador replied "Oh, Yeh [sic], the park."  (Id.)  Mihaly

thought the "answer did not strike him as being truthful."  (Id.)  Mihaly was always looking for

employees to work at Three Rivers Stadium, and handed Meador his gold-colored business card

case and told him to take a card, which Meador did.  Mihaly dropped Meador off in Forest Hills.

(Pl.'s facts ¶ 43.)

Meador called Mihaly on August 19, 1988 at approximately 1:30 p.m., seeking an

employment opportunity.  At 5:40 p.m. on August 19, 1988, Mihaly reported Meador to the

police.  Mihaly also turned over his business card case to be tested for fingerprints, because

Meador held the case.  (Pl.'s facts ¶ 43.)

Mihaly's testimony was corroborated by Stephen Kovacich ("Kovacich"), a gas station

attendant.  Kovacich worked at Bob's Autotorium and Gas Station, which was located adjacent

to the Rankin Bridge.  On the night of the murder, Kovacich saw a black male who was

approximately 18 years of age sitting on a step owned by the gas station; the young man was

approximately 140 pounds with a thin build.  The individual told Kovacich he was waiting for a

ride, and Kovacich told him to leave.  (Pl.'s facts ¶ 44.)

On September 1, 1988, defendants interviewed Meador.  Meador repeatedly denied being

in the area the night of the murder and stated he did not hitchhike.  He acknowledged that he

normally stayed with his mother in the Mon View Heights Housing Project.  Meador claimed,

11

however, that on the night of the murder he was staying with his girlfriend who lived in Wilkinsburg.  His girlfriend was pulled over as she was driving during the early hours of August 17, 1988, and the car was impounded by the Swissvale Police.  Meador was a passenger in the vehicle.  His girlfriend's uncle, Earnest Bowden ("Bowden"), picked them up at the Swissvale Police Department.  Meador stated that Bowden dropped them off at his girlfriend's Wilkinsburg residence at approximately 2:00 a.m. on August 17, 1988, and Meador claims he stayed at that residence the rest of the evening.  Meador stated that he got the card from Mihaly two days later, on August 19, 1988, when Mihaly approached him in Wilkinsburg.  (Pl.'s facts ¶ 45.)

Defendants conducted a seconded interview of Mihaly on September 2, 1998, in which Mihaly refuted Meador's comments.  Mihaly stated he had not been in Wilkinsburg all year, had only given one card out within the preceding several weeks, and was working a baseball game on August 19, 1988.  (Pl.'s facts ¶ 46.)  Mihaly stated that Meador's version of the events was a "lie."  (Pl.'s facts, Ex. G-12.)

Bowden's statements also refute Meador's version of events.  Bowden testified that he drove Meador and his girlfriend to Midway Drive in the Mon View Heights Projects.  Between 2:00 a.m. and 2:30 a.m., just prior to the murder, Meador entered the residence of his mother.  Meador got into an argument, and Bowden alleged he waited an hour to an hour and a half.  He thereafter drove his niece home to Wilkinsburg.  (Pl.'s facts ¶ 47.)

The government did not investigate Meador any further.  He was not subjected to a polygraph examination or made part of a line-up, and his photo was not shown to any witness in a photo array.  The fingerprint lifted from Mihaly's card case was never compared with those of other potential suspects besides Whitley.  Foote admitted that they should have been.  (Pl.'s facts ¶ 48.)  Lazzaro was asked why no further investigation was performed with respect to Meador, to

12

which he replied "I just assumed that we thought we had him alibied, and I just don't know what else happened to him."  (Pl.'s facts, Ex. J-37.)

Whitley's prints were tested with those lifted from the card case, and did not match. (Pl.'s facts, Ex. E-116.)  Defendants had two latent fingerprints from the crime scene which did not match prints gathered from either Whitley or Malloy.  (Pl.'s facts, Ex. E-119.)  Although the fingerprints were "available for any future comparisons you desire," the prints from the crime scene were not tested with Meador or Tench.  (Pl.'s facts, Ex. E-119; Pl.'s facts, Ex. J-37.)

Whitley's mother, Hati Whitley, provided an alibi for Whitley.  She stated that Whitley told her he saw his girlfriend, Barbara Brown ("Brown"), with an alcoholic beverage at 2:30 a.m. on August 17, 1988, in the Mon View Heights Housing Projects as she was coming home from a local bar.  (Pl.'s facts ¶ 52.)  Brown confirmed that she left the bar at approximately 2:15 a.m., and with a group of friends walked to a friend's house in the Mon View Heights Housing Projects.  Brown stated she arrived at her friend's house between 2:30 a.m. and 2:45 a.m.  She stated one of her friends carried a beer.  (Pl.'s facts ¶ 53.)

Although charges were brought against Whitley with respect to the Malloy's homicide, Lazzaro admitted there was no physical evidence linking Whitley to the crime.  (Pl.'s facts ¶ 22.) Two latent fingerprints recovered from the murder scene did not match Whitley's fingerprints. The hat worn by the assailant measured 22 and 1/8 inches in circumference, but Whitley's head measured 23 inches.  (Pl.'s facts ¶ 24.)  Shoeprints from the scene did not match Whitley's shoes.  (Pl.'s facts ¶ 25.)  Newport cigarette butts were found in the stairwell near the scene of the murder, but Whitley did not smoke Newport cigarettes. (Pl.'s facts ¶ 26.)  Dried blood was discovered underneath Whitley's fingernails; Whitley voluntarily provided genetic samples to the police, but the dried blood was not tested with Whitley's or with anyone else's genetic

material.  (Pl.'s facts ¶ 27.)  Witnesses testified that Malloy struggled with the assailant and had

dried blood under her fingernails, and a physical examination of Whitley the day after the murder

revealed no scratch marks or any other marks indicating a struggle.  (Id.)   Whitley requested a

lie detector test, but was not subjected to one.  (Pl.'s facts ¶ 38.)

Drew Whitley was arrested on February 10, 1989.  (Pl.'s facts, Ex. D-75.)  An affidavit of

probable cause was prepared in order to obtain an arrest warrant; the affidavit reads:

> The following information was gathered at the scene by
> your affiants, or by other investigators and told to your affiants:
> Miss Malloy was a manager at the McDonald's Restaurant. Her
> work shift had finished at approx. 2:30 am, Aug. 17, 1988. As
> Miss Malloy and other employees were leaving the restaurant,
> Miss Malloy was accosted by a B/M described by witnesses as
> being 6'1" to 6'2" or taller with a very thin build, wearing a
> yellow/beige trenchcoat, belted securely around the waist, a
> stocking mask, a white or beige hat with a brim all the way around,
> white tennis shoes, and brandishing a small handgun in his right
> hand. The assailant grabbed Miss Malloy around her neck using
> one arm, while he pointed the gun to her head, and held the gun
> with his other hand. The actor demanded "the bag", and while the
> actor was holding the victim and pointing the gun at her head, he
> was yelling, "Give me the bag. Give me the bag." The victim was
> responding that she did not have any bag to which the actor
> responded that he would shoot her if she would not give him the
> bag. Subsequently the victim broke free from the grasp of the
> actor, and the actor fired a shot into the air.  The actor then pulled
> back on the top of the pistol, which caused a spent casing to be
> ejected from the pistol. The casing was recovered from the scene
> and was a .25 caliber casing which would have been ejected from a
> .25 caliber semi-automatic pistol. As the victim was running away,
> she was being chased by the actor who then fired a second shot
> which struck the victim in her back, thus ultimately caused her
> death. After he shot the victim, the actor again grabbed the victim
> and beat her about the face with the handgun, and at that time he
> grabbed the purse from her and fled on foot across Hoffman Blvd.
> into the Kennywood Park Parking Lot.
> Dets. Payne and Fitzgerald of the Allegheny County Polide
> Homicide Division interviewed Jerome Wilson, a McDonald's
> Restaurant employee and a witness to the shooting. Mr. Wilson
> told dets. that he was sitting on a corner of the sidewalk at the
> restaurant as the victim and other employees were exiting the

14

restaurant. At that time he became aware of an individual (the actor) coming up from a basement stairwell located on the exterior west wall of the building. At that time the actor came toward Mr. Wilson, pointed a firearm at him and told him "Don't move." Mr. Wilson then observed the subsequent shooting, robbery and flight of the actor. Mr. Wilson told Dets. Payne and Fitzgerald that he recognized the actor and identified him as Drew Whitley of Bldg. 19 in the Mon View Heights Housing Projects in West Mifflin. Mr. Wilson stated that Whitley has been a nearby neighbor of his for three years.

On Aug. 17, 1988 a postmortem examination on the body of the victim was performed at the Allegheny County Morgue by Coroner Dr. Joshua Perper and pathologist Dr. Katherine Jasnosz. Following the examination it was the conclusion of Dr. Perper and Dr, Jasnosz that the victim died as the result of a gunshot wound to the back, and the manner of death was deemed to be homicide.

Based on the information contained herein, your affiants believe and aver that probable cause exists to believe that Drew Whitley shot Noreen Malloy in the back shortly after 2:30 am, Aug. 17, 1988, and Noreen Malloy died as a result of the gunshot wound she received. Your affiants therefore request that an arrest warrant be issued charging Drew Whitley with violation of PCC 2501 Criminal Homicide.

(Def's Ex. D.)

Two days before the issuance of the arrest warrant for Whitley, Gary Starr ("Starr"), a convicted murderer on death row, wrote to authorities explaining that six months earlier Whitley confessed to the murder while he was incarcerated in a cell adjacent to Whitley.  (Pl.'s facts ¶ 28; Defs.' Mot. for Summ. J., Ex. F-10 at 884-85.)  Whitley was housed in a cell adjacent to Starr for five days.  (Pl.'s facts ¶ 29.)   Whitley's cellmate for ninety days, Kenneth Willmer ("Willmer"), stated that Whitley always maintained his innocence.  (Id.)

Starr later asserted that Bob Bricker ("Bricker") and Arty Gorley ("Gorley") would allege that he was lying about Whitley's confession.  (Pl.'s facts ¶ 30.)  Plaintiff was not made aware of this assertion.  Defendants did not interview either Bricker or Gorley, even though Foote admitted that such a follow-up investigation should have been conducted.  (Id.)

15

Starr stated that Whitley admitted he threw the murder weapon over a hillside across the street from the McDonald's Restaurant.  At least nine detectives conducted a search of the hillside at the end of Inland Avenue in April 1989.  The detectives did not find the weapon. (Pl.'s facts ¶ 31.)

At Whitley's trial, Starr was questioned with respect to his reason for bringing this information to the attention of the authorities, and Starr denied receiving an inducement for his testimony at trial:

> Q.      . . .  And you wrote to the District Attorney on February 6?
>
> A.      Yes, sir. The reason I did this, when I seen Mr. Chris Conrad was questioning him, and I knew about it, and I came forward because it was on my conscience.
>
> Q.      On your conscience?
>
> A.      Yes, sir.
>
> Q.      It wasn't on your conscience in March.
>
> A.      When?
>
> Q.      March.
>
> A.      That is when I wrote the letter. I wrote the letter in February.
>
> Q.      I'm sorry. It wasn't on your conscience in September.
>
> A.      No, because I had forgot about it.
>
> Q.      It wasn't on your conscience in October?
>
> A.      I forgot about it.
>
> Q.      It wasn't on your conscience in November?
>
> A.      Like I said, I forgot about it until I seen he was being questioned.

Q.      How do you know he was being questioned?

A.      I seen his name in the paper. I know it was him.

Q.      It didn't have anything to do with the fact you are on court supervision as you told the District Attorney, and "maybe if I come up with something real good, I'll be off of that court supervision." That never entered your conscience?

A.      No, sir.

Q.      Never? Not even to this day?

A.      No, sir.

Q.      You are just doing this because you are the law abiding citizen that Gary Starr is?

A.      I was doing it because it was on my conscience, and I wanted to get it out.

(Defs.' Mot. for Summ. J., Ex. F-10 at 884-86.)

Plaintiff alleges that defendants concealed the existence of a plea bargain between Starr and the government, "essentially falsifying Starr's testimony against Whitley." (Pl.'s facts ¶ 35.) A letter dated May 1, 2006, from James Daniel Hardin II to Stephen A. Zappala, Jr., of the Allegheny County District Attorney's Office, reads:

> As you're aware, today former wrongfully convicted inmate Drew Whitley was released from prison after DNA tests proved conclusively that he was not the man that murdered Noreen Malloy, 22, outside a Duquesne fast-food restaurant in 1988. While I'm certainly very happy for Mr. Whitley, his wrongful conviction was due in large part because an over zealous prosecutor chose to use the false testimony of a lying jail-house-informant named Gary Lee Starr who was on Death Row.
> . . . .
> Instead of paying the ultimate price for the second life he premeditatedly took he cuts a deal with the Allegheny County District Attorney's Office to offer favorable government testimony against Drew Whitley in exchange for having his Death Sentence reduced to Life. What a sweet deal for him, huh? Now that DNA tests have proved conclusively, 18 years later, that Gary Lee Starr's

17

testimony against Drew Whitley was deliberately concocted perjury he, Starr, cannot be charged with perjury because the 5 year statue [sic] of limitations has expired. However, since his plea bargain was contingent on the fact that his testimony be truthful, and now it's been proven to be untruthful, you can now petition the court to vacate the former plea bargain and to reinstate his Death Penalty. I had 2 separate lying jail-house informants give false testimony against me at my trial and I ended up wrongfully convicted as a result so I feel very deeply about this subject. You were not the D.A. at the time so you're not to fault but you owe it to Drew Whitley and his family to have Gary Lee Starr's plea bargain revoked. Please do the right thing!

(Pl.'s facts, Ex. I-23.) An article in the Pittsburgh Tribune Review reporting on Whitley's release from jail following the results of the DNA tests summarized the evidence introduced at the trial, and noted that "death row inmate Gary Lee Starr testified that Whitley confessed to the murder during a jailhouse conversation. Starr was taken off death row in exchange for his testimony." (Pl.'s facts, Ex. I-26.) Similarly, an article in the Pittsburgh Post-Gazette reads: "Gary Starr, a twice-convicted murderer on death row, had his sentence reduced to life in prison after testifying that Mr. Whitley had confessed killing to him while both were in prison." (Pl.'s facts, Ex. I-27 to I-28.)

Whitley's counsel in the state court homicide case filed an omnibus pre-trial motion, which the state court addressed at a hearing prior to trial. (Def's Ex. F-1 at 4.) The omnibus pre-trial motion included a motion to suppress that challenged a search warrant issued for the August 18, 1988 search. Whitley's counsel alleged "that in securing the search warrant that the police failed to inform the magistrate of some inconsistent statements, and that in doing so, failing to inform the magistrate, violated the defendant's Fourteenth Amendment rights, and also having ex parte search warrant issued withholding pertinent facts from the magistrate." (Id. at 7-8.) Whitley also filed a pro se motion to suppress. The motion had two parts. The court read the first part as concerning the "prima facie case proved at the point of inquest." (Id. at 8.) The

court did not understand the second part, but read it as concerning "the Motion to Suppress the identification." (Id.)

At the hearing, the Commonwealth called Foote as a witness. Foote explained that the affidavit of probable cause for the search warrant relied upon Wilson's identification of Whitley as the shooter. (Id. at 10-15.) On cross-examination, Whitley's counsel questioned Foote about Wilson's failure to identify Whitley during the first interview. (Id. at 16-22.) No other witnesses were called, and the parties did not offer any additional evidence. (Id. at 22.) The state court asked if the parties wished to make an argument; Whitley's counsel contended:

> Judge, I think under Frank versus Delaware and Illinois versus Gates, I think when you have a search warrant and it is obviously taken before a neutral and detached magistrate that the police have the burden -- I'm sorry -- the duty of informing the magistrate of the facts that they have to establish probable cause. In this particular case, you have an eyewitness to the crime who is interviewed immediately thereafter and who apparently does not -- apparently does not tell the police who the assailant is. The next day after being contacted by the police through an informant, he tells the police that he recognizes the defendant. That is the end of reading the whole affidavit. That is the only testimony whatsoever that connects Mr. Whitley to this crime. I think that the police have an affirmative duty at that point to provide some other evidence to the magistrate to support and corroborate the testimony of the purported witness. In other words I think that the Fourth Amendment requires that the police go to the magistrate and say in a written form, Your Honor -- in their affidavit they describe what occurred, which they did in this particular case. I think at that point they have a right to say, "A witness who we say tells us who the assailant was gave a prior inconsistent statement the night of the crime, but the next day he adds to or changes his testimony and tells us that he knows the assailant, and further that his second statement is supported by this evidence which we believe establishes probable cause to believe that what we are looking for is in that apartment." The reason I asked the question about the gun, we have Jerome Wilson who says initially, "I don't recognize anybody." However, he says it is a .22 caliber pistol. The police in the affidavit of search warrant are looking for a .25 caliber pistol, that being supported by the physical evidence which is found at the scene, that is, that Ms. Malloy was killed with a .25 caliber.

. . . .

      Maybe if the witness says it was a .22, maybe they don't have probable cause to go look for a .25. That is the whole issue. That is the whole point.

. . . .

      [T]heir witness who is supplying all of the information says it was a .22. Based upon that, Your Honor, I would ask you suppress the fruits of the search of August 18.

(<u>Id.</u> at 22-25.)

The court denied the motion to suppress, stating:

      As to whether or not the police not informing the magistrate Jerome Wilson had given the police one prior inconsistent statement, whether or not that violated the defendant's Fourteenth Amendment rights in having an ex parte search warrant issued by withholding the information from the magistrate, I submit the following. In order to secure a search warrant, the affiant must provide the magistrate with information consistent to persuade a reasonable cause to search. The information must give the magistrate an opportunity to know and weigh facts and determine objectively when there is a need to invade a person's privacy to enforce the law. The case of the Commonwealth versus Tucker, 252 Super., page 594, 1987 case, the Court further in Tucker held a misstatement of fact would invalidate a search warrant and provide suppression of the fruits only if the misstatement of facts are deliberate and material. A material one is probable cause to search would not exist. Inclusion of false evidence would not invalidate the search warrant if based on other information that is valid and sufficient to validate probable cause. No one portion of the affidavit will supply probable cause. A determination of probable cause should be made from consideration of the affidavit in its entirety. The Court's consideration of individual allegations of fact may be necessary in certain circumstances such as where there is such an allegation involving a misstatement of facts derived from exhortation of illegal conduct, which you do not have. The Court in the instant case concludes that the evidence at issue provided a sufficient basis for an independent determination by a neutral judicial officer that probable cause existed, and we can answer that question affirmatively because the test would be a totality of the circumstances case which was formed in the case of Illinois versus Gates and adopted by the Pennsylvania Courts in Commonwealth versus Gray. The test essentially states the issuing authority is simply to make a practical common sense determination given all the - circumstances set forth in the affidavit before him, including

20

veracity and knowledge of the person employing hearsay information it is a fair probability that contraband evidence of a crime will be found in a particular place, and a duty of a reviewing court is to ensure that the magistrate had a substantial basis for concluding probable cause existed.  As to mention the case of Frank versus Delaware where the defendant is entitled to a hearing if there is an allegation that a false statement was given in an attempt to establish probable cause, and upon review of the testimony from Officer Foote, this Court has allowed the hearing on that particular issue. Now also note that in this type of hearing the only thing to be determined is the veracity of the affiant, and not the veracity of any informant. Now in the instant case we do not have an informant. We have an individual, Jerome Wilson, who does in fact exist, that the defense knows he was interviewed and in fact interviewed twice by the police. He gave the statement to the police, and there was testimony here at trial when asked the reason why he didn't indicate who the person was initially, he indicated to the police that the reason why he didn't tell them first, he was scared of that individual and scared of that person's reputation, but nonetheless, the second interview he did give the name of the defendant as the person who committed the offense. Therefore, there is nothing that we can ascertain by applying the totality of the circumstances of the affidavit of probable cause in the instant case would indicate that a false statement, knowingly, intentionally, was involved in the affidavit submitted to the magistrate, and deny that portion of that motion.

(Id. at 27-31.)

In 2006, Whitley was exonerated after DNA evidence was tested.  (Pl.'s facts ¶ 65.) The Commonwealth filed a petition for nolle prosse and an order of court granting the same was entered on May 1, 2006, effectively concluding Whitley's case.  (Pl.'s facts ¶ 66.)

With respect to officers, the Allegheny County training programs in the Homicide Division were carried out almost entirely "on the job."  The training did not include any instruction with respect to administering polygraphs or gathering DNA evidence from crime scenes.  (Pl.'s facts ¶ 54.)

All defendants believed that polygraphs were not to be used on suspects, because they were unreliable and not admissible in court.  (Pl.'s facts ¶ 55.)  Allegheny County Police

Policies, however, provided that polygraphs were a "valuable investigative aid" that can be used "to establish probable cause to seek a search warrant." (Pl.'s facts, Exs. P-1, P-2.) Lazzaro stated the tests were useful to for "someone who may have information about a crime to see if they would come across if we could catch them in a lie." (Pl.'s facts, Ex. J-35.) Lazzaro did not believe the tests were useful on suspects. (Pl.'s facts ¶ 55.)

Records in Lazzaro's personnel file indicated he "lacked initiative," failed to pay attention to details, and lacked "drive." (Pl.'s facts, Ex. J-73.) Lazzaro was never told of these performance deficiencies. (Pl.'s facts ¶ 57.) When asked why he did not test fingerprints recovered from the crime scene with Meador after it was determined the prints were not Whitley's, Lazzaro replied: "Like I said, you know, back then, I just assumed that we thought we had him alibied, and I just don't know what else happened to him. . . . We just didn't do it." (Pl.'s facts, Ex. J-37.) Lazzaro was specifically asked about his initiative with respect to certain aspects of the investigation of Malloy:

> Q.   Can we agree that you did not take any initiative to make sure that the genetic material underneath Ms. Malloy's fingernails was compared to the genetic material you obtained from Mr. Whitley?
>
> A:   Yes.
>
> . . . .
>
> Q:   We can agree that you didn't take the initiative to compare genetic samples from Mr. Meador or Mr. Tench to any of the genetic evidence gathered in this case?
>
> A:   Yes.
>
> . . . .
>
> Q:   Can we agree that you didn't take the initiative to show Mr. Bouton a photo lineup of either Mr. Whitley or Mr. Meador or Mr. Tench or anyone?

A:      Yes.

. . . .

Q:      Can we agree that you . . . did not take the initiative to show him a photo lineup of either Mr. Whitley, Mr. Tench, Mr. Meador or anybody involved potentially in the murder?

A:      Yes.

. . . .

Q:      Can we also agree that you did not take the initiative to show Mr. Wilson a photo I.D. or photo lineup of Mr. Whitley, Mr. Tench, Mr. Meador or anyone?

A:      Yes.

. . . .

Q:      What if you did a photo lineup of folks all with stocking masks on? You would get the physical impressions of these people, the size, the weight, the height, the shape of the head and so forth? . . . Couldn't you have done that?

A:      I imagine we could have.

. . . .

Q:      And you didn't take the initiative to do that, did you?

A:      We didn't do it.

. . . .

Q:      So we can agree that you never took the initiative to try to obtain information from Gary Covington regarding the gun that he owned, right?

A:      We did not.

(Pl.'s facts, Exs. J-43 to J-44, J-50 to J-51, J-54 to J-55, J-60.)

23

Torbin received several negative performance reviews.  (Pl.'s facts ¶ 61.)   He was characterized as "los[ing] interest when assigned to routine tasks" and exhibited a "willingness to loaf, and do only what he's told to do, nothing more, nothing less . . . he is lacking initiative." (Pl.'s facts, Ex. L-78 to L-79.)   Torbin's co-workers described him as "opinionated and forceful," which led to "friction."  (Pl.'s facts, Exs. L-74, L-77.)   Torbin was in need of a "change in attitude and proper guidance."  (Pl.'s facts, Ex. L-79.)

When asked if performance deficiencies were ever addressed, Payne testified: "Never. Never. We were never communicated to about these. We had never seen these. I never talked to any sergeants ever in 26 years because – hard as it is to believe, but that's the way it worked." (Pl.'s facts, Ex. M-27.)  Payne, who is now the chief of police, said that this type of information should be brought to the attention of the respective officers.  (Pl.'s facts ¶ 64.)

### Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).

The nonmoving party must point to specific affirmative evidence in the record, rather than rely upon conclusory or vague allegations or statements.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Concrete evidence must be provided for each element of each of the claims, and the evidence must be such that a reasonable fact-finder could find in that party's favor at trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "A nonmoving party, like

plaintiff, must 'designate specific facts showing that there is a genuine issue for trial.'" <u>Orenge v. Veneman</u>, No. 04-297, 2006 WL 2711651, at *6 (W.D. Pa. Sept. 20, 2006) (citing <u>Celotex</u>, 477 U.S. at 324).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  <u>Anderson</u>, 477 U.S. at 248.  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Id.</u> at 249.  The court may consider any evidence that would be admissible at trial in deciding the merits of a motion for summary judgment.  <u>Horta v. Sullivan</u>, 4 F.3d 2, 8 (1st Cir. 1993); <u>Pollack v. City of Newark</u>, 147 F. Supp. 35, 39 (D.N.J. 1956), <u>aff'd</u>, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

### *Discussion*

In moving for summary judgment, defendants argue: (1) individual defendants are not persons under 42 U.S.C. § 1983 in their official capacities; (2) plaintiff's complaint is barred by the statute of limitations; (3) plaintiff has not set forth sufficient evidence to establish issues of fact with respect to his malicious prosecution claim; (4) the explicit source rule bars plaintiff's Fourteenth Amendment claim; (5) the defendants are entitled to immunity under the PSTCA with respect to plaintiff's state law claim, and (6) Allegheny County cannot be subject to liability since there is no evidence of a policy or custom necessary to establish its liability.  The court does not find the need to address every argument raised.

The court initially finds that the individual defendants cannot be sued in their official capacities.  The court also determines that, although the statute of limitations does not bar plaintiff's claims, plaintiff did not adduce sufficient evidence to establish his malicious prosecution claims raised in counts I and II, and defendants are entitled to qualified immunity with respect to plaintiff's right to a fair trial claim.

## I. Fitzgerald, Lazzaro, Foote, Torbin, Markle, and Payne in Their Official Capacities

In their motion, individual defendants argue that the § 1983 claims asserted against them in their official capacities should be dismissed because defendant Allegheny County is a named defendant in this case and thus, the claims are redundant and unnecessary.  Plaintiff did not respond to this argument.  A public official "in his 'official capacity' is legally indistinct from the municipality for which he serves."  Kenny v. Whitpain Twp., No. 96-CV-3527, 1996 WL 445352, at *2 (E.D. Pa. 1996) (citing Brandon v. Holt, 469 U.S. 464, 471-73 (1985)); see Taylor v. Pilewski, No. 08-611, 2008 WL 4200247, at *1 (W.D. Pa. Sept. 8, 2008).  "[C]laims against individual defendants in their official capacities are equivalent to claims against the governmental entity itself" and may be dismissed for such claims are redundant.  Burton v. City of Philadelphia, 121 F. Supp.2d 810, 812 (E.D. Pa. 2000) (citing Hafer v. Melo, 502 U.S. 21, 25 (1991)).  By bringing official capacity suits against the individual defendants and Allegheny County, plaintiff is essentially naming Allegheny County multiple times as a defendant.  See Satterfield v. Borough of Schuylkill Haven, 12 F. Supp.2d 423, 432 (E.D.Pa. 1998).  This court finds that since Allegheny County is a named defendant in this case, any § 1983 claims against individual defendants in their official capacities are redundant and summary judgment will be granted on those claims.  Claims against individual defendants in their individual capacities, by

26

contrast, are not redundant, and the court will proceed to analyze plaintiff's claims with respect to defendants in their individual capacities.

## II.   Doswell v. City of Pittsburgh, No. 07-0761 (W.D. Pa.)

Before individually addressing the remainder of defendants' summary judgment arguments, the court notes that there are a number of similarities between the issues presented in this case and those presented in Doswell v. City of Pittsburgh, No. 07-0761 (W.D. Pa.).  A detailed analysis of that case is merited here, given the similarities between the two situations.

In Doswell, the plaintiffs brought various claims against the City of Pittsburgh, Detective Herman Wolf, and unnamed supervisors of Wolf, based upon plaintiff Thomas Doswell's conviction for rape and his subsequent nineteen-year incarceration.  Doswell asserted claims under § 1983 contending that the defendants violated his

> right to be free from false arrest and imprisonment, malicious prosecution, use of false or perjured testimony, unlawful conviction and incarceration, and cruel and unusual punishment[.] He was further denied his right to a fair trial, his right not to have evidence fabricated against him, to the required disclosure of exculpatory and Impeachment evidence, and to fair identification procedures, all in contravention of the Fourth, Fifth, Eighth and Fourteenth Amendments. . . .

Doswell v. City of Pittsburgh, No. 07-0761, 2007 WL 2907886, at *2 (W.D. Pa. Oct. 2, 2007) ("Doswell I").  Doswell also asserted a claim under Pennsylvania state law for malicious prosecution.  Id. at *3.

The factual background in Doswell involved the rape of Helen Tokar early in the morning on March 13, 1986, in the lunchroom at her place of employment.  After completing the rape, the assailant unlocked the lunchroom door and pushed past Ora Joan Bolte, one of Tokar's co-workers who pounded on the locked door for several minutes during the rape.  Doswell v.

City of Pittsburgh, No. 07-0761, 2009 WL 1734199, at *2 (W.D. Pa. June 16, 2009) ("Doswell II").

Wolf was one of the detectives assigned to investigate the case. In 1984, several years before the rape of Tokar, Doswell was charged with the rape of Victoria Johnson, but was acquitted. Wolf was the lead detective on that case, and Wolf threatened Doswell after the acquittal, saying he would "get him." Id. at *2.

With respect to Tokar's rape, Wolf identified Doswell as a suspect even before interviewing Tokar. Wolf assembled a photo array of eight suspects to present to Tokar. Doswell's photo had writing on it, including the letter "R" in a different font and color than the other writing on the photo. The other photos did not contain the letter "R." At that time, the Pittsburgh Police Department would put an "R" on the photo of the individual it deemed the main suspect in a sexual assault case, and would not include the "R" on the other photos of the array. At Wolf's deposition, he testified that the "R" stood for rape. Wolf also testified that, at both the time he assembled the photo array and at the time of his deposition, he believed the use of the "R" was unconstitutional. Id. at *3.

Several hours following the rape, Wolf interviewed Tokar. Tokar told Wolf that her assailant had a "whisker growth" on his face. Wolf showed Tokar the photo array, and she identified Doswell as the assailant. After the interview with Tokar, Wolf interviewed Bolte. Wolf showed her the same photo array, and she also identified Doswell. Tokar was confident in her identification of Doswell through the time of her deposition in 2008. Id. Bolte, however, did not share the same confidence. Bolte stated that she told Wolf during the interview that she could not identify the assailant, but Wolf kept pointing to Doswell saying "this is the one." Id. at *5. After the interview, Bolte said she told a private investigator that she only saw the assailant

for a few seconds and did not see him well enough to identify him. After learning of this, Wolf visited Bolte at work and was angry and frightened her. Bolte alleged that Wolf told her not to tell anyone that she could not identify the assailant. Wolf drove Bolte to the courthouse on the day of trial and instructed her to testify that she saw the assailant and to identify the assailant as Doswell. Bolte said "[t]he only reason I picked [Doswell] out in the courtroom is because Detective Wolf told me to and I was afraid of him." Id.

During the afternoon of the day of the rape, a police officer arrested Doswell at his girlfriend's home. That officer was informed by others in the police department that the perpetrator of Tokar's rape was expected to have a mark on his head where Tokar hit him with a cup. The officer examined Doswell's head, and did not observe any bumps, bruises, or marks. The police officer knew Doswell from his assignment to a particular neighborhood, and saw Doswell consistently wearing a neck brace in the days and weeks prior to the arrest. Id. at *3. After arriving at the police station, Wolf interviewed Doswell. Doswell first told Wolf that he spent the night at his mother's house, but later stated he spent the night at his girlfriend's house. Wolf did not take photographs of Doswell's head at the interview. Id. at *4.

Doswell's attorney moved to suppress eyewitness identification, arguing that the photo array was subjective and tainted a witness identification at a preliminary hearing. The judge determined that the photo array was not unduly suggestive. Id. The judge stated:

> This Court finds after hearing and consideration of argument of counsel, that probable cause did exist. The basis for the probable cause is the selection of the defendant's picture from the photo array that was presented. The Court finds that the photo array was not unduly suggestive.
> The factors that the Court is considering in making that determination are this: The photos shown are of individuals basically of the same age, race, hairstyle, facial features, plus the number of photos that were presented were sufficient to render the photo array acceptable.

> The problem with the R – I find that although it is worthy of consideration by the Court, that after thinking about it I don't believe that it was unduly suggestive. I am not saying it is the best practice in the world, but just to have the letter R on the plate which also contains other numbers-approximately twelve numbers or so on the plate-there is no evidence that the victim would have had any background or any other knowledge that would give her an idea of what the R would stand for and that in and of itself they are-in and of itself was unduly suggestive.
>
> Therefore, I do find that the photo array was not unduly suggestive and, therefore, any other identifications that were made subsequently such as at the preliminary hearing were also not tainted.

Id. at *6.

Trial began on November 19, 1986. During the trial, Tokar and Bolte identified Doswell as the rapist. Wolf testified that Doswell had a mark on his head at the time of arrest, was recently shaven, changed his alibi during interrogation, and wore a neck brace at the preliminary hearing that appeared brand new. Doswell was convicted.

Doswell appealed to the superior court, which affirmed the judgment holding that the trial court did not err in denying his motion to suppress the identification. Id. at *4. The superior court held:

> In the case at hand, the attack upon the victim lasted fifteen minutes in a well-lighted area. The victim's initial description of appellant corresponded with his actual appearance. The time lapse between the attack and the victim's selection of appellant's photograph was minimal. Finally, the victim's certainty regarding her identification of appellant as the assailant never wavered. We therefore find that the trial court was correct in declining to suppress the photographic identification of appellant.

Id. at *6.

In 2005, a judge ordered DNA testing. The Allegheny County Crime Laboratory conducted the testing and concluded that the source of the assailant's sperm was not Doswell.

The district attorney's office and Doswell's lawyers moved to vacate his conviction, and the court granted the motion.  Id. at *4.

The defendants filed a motion to dismiss.  They argued that the federal constitutional claims were barred by the statute of limitations.  The court held that Doswell's claim was time-barred based upon Wallace v. Kato, 549 U.S. 384 (2007), to the extent he asserted a claim for damages for false arrest or false imprisonment in violation of the Fourth Amendment.  The court refused, however, to accept the defendant's "attempt to read Wallace so expansively as to apply [to] the remainder of the § 1983 claims."  Doswell I, 2007 WL 2907886, at *2.  The court held that the § 1983 malicious prosecution claim was not barred by the statute of limitations, nor were the other federal constitutional claims.  One element necessary to establish a claim of a malicious prosecution is that the proceedings must end in the plaintiff's favor.  The court believed the statute of limitations for Doswell's claim did not begin to run until this element was met.  The court explained:

> [T]he Wallace court expressly acknowledged the difference between a false arrest claim and a malicious prosecution claim, indicating that each claim accrues at a different time.  A malicious prosecution claim asserted under § 1983 necessarily impugns the validity of the underlying conviction.  It has long been established that when a § 1983 claim would "[i]mpug[n] the validity of the plaintiff's underlying conviction," a plaintiff [i]s barred from asserting that claim "unless the conviction has been reversed on direct appeal or [i]mpaired by collateral proceedings."  [Gilles v. Davis, 427 F.3d 197, 209 (3d Cir. 2005) (citing Heck v. Humphrey, 512 U.S. 477 (1994))].  Doswell was not exonerated until August 1, 2005.  He brought this suit within two years of that date.  According to Heck and its progeny, then, the § 1983 claim based upon malicious prosecution is timely.  Further, I find that the remaining constitutional violations . . . are more akin to malicious prosecution claims and Wallace [i]s distinguishable on that basis.

Id. at *2.

After discovery, the defendants filed a motion for summary judgment.  The defendants

again challenged the § 1983 malicious prosecution claim.  The defendants sought dismissal of

the claim based upon the argument that probable cause existed to initiate the criminal

proceeding.  The court stated: "In section 1983 malicious prosecution actions, the threshold issue

is the existence of probable cause."  Doswell II, 2009 WL 1734199, at *5 (citing Lee v.

Mihalich, 847 F.2d 66, 70 (3d Cir. 1988)).

The court noted that "Doswell's malicious prosecution claim is premised on what he

characterizes as an unduly suggestive photo array, and exculpatory evidence that was not

provided to the judge."  Doswell II, 2009 WL 1734199, at *5.  The court held that collateral

estoppel prevented Doswell from rearguing whether probable cause existed.  The court observed:

> "Under Pennsylvania law, the elements of collateral estoppel are:
> (1) the issue was identical to the one presented in the later action;
> (2) there was a final judgment on the merit s [sic]; (3) the party
> against whom the plea is asserted was a party or in privity with a
> party to the prior adjudication; and (4) the party against whom it is
> asserted had a full and fair opportunity to litigate the issue in
> question in a prior action."

Id. at *7 (quoting James v. Heritage Valley Fed. Credit Union, 197 F. App'x 102, 105 (3d Cir.

2006)).  The court found that all four elements were met.  Id.

The court addressed Doswell's argument that the Court of Appeals for the Third Circuit's

opinion in Montgomery v. De Simone, PTL, 159 F.3d 120 (3d Cir. 1998), abrogates the

preclusive effect of state criminal court's findings, because the conviction was vacated.  The

court distinguished Montgomery, since, in that case, the appellate court directly vacated the

conviction.  In Doswell's situation, however, his conviction was vacated because of DNA

evidence.  Doswell II, 2009 WL 1734199, at *7.  Additionally, the appellate court's decision to

vacate in Montgomery was apparently based upon a finding that probable cause was lacking:

Thus, in <u>Montgomery</u>, the Third Circuit refused to permit a presumption of probable cause based solely on the municipal court conviction where that conviction was subsequently vacated by the Superior Court.   Notably, the Superior Court in <u>Montgomery</u> reversed both the conviction *and cast doubt on the finding of probable cause itself.*   Here, however, Doswell's conviction was vacated on other grounds – DNA evidence that was not available at the time of his conviction.   The probable cause determination of the trial court and its affirmation by the Superior Court were in no way implicated by this new evidence.   Nor is this a case where a presumption of probable cause stems solely from the fact of the criminal conviction.   Rather, it was expressly held by the trial court and affirmed by the Superior Court that the photo array established probable cause to arrest Doswell.

The case law relating to the preclusive effect of suppression hearings in civil rights actions has not been overruled or even questioned.   Reading <u>Montgomery</u> and its progeny, I do not believe that the Third Circuit intended to obliterate the underlying legal holdings in all overturned or vacated criminal cases, regardless of the basis on which the convictions were vacated. . . .

<u>Id.</u> at *8 (emphasis added).

The defendants also moved for summary judgment on the remainder of Doswell's § 1983 contentions, which the court characterized as "due process violations."   <u>Id.</u> at *1.   These included allegations that Wolf (1) was biased against Doswell from the outset of the case, (2) used a suggestive photo array, (3) engaged in suggestive conduct with Tokar in order to ensure she would identify Doswell, (4) pressured Bolte into identifying Doswell, (5) fabricated evidence that Doswell had an injury to his head at the time of arrest and that Doswell pretended to have a debilitating neck injury, (6) failed to investigate a related case committed within an hour of the rape of Tokar, and (7) covered up exculpatory evidence revealed in the investigation of that case. The court noted that "'[a] defendant has a due process right to a fair trial.  Government agents may not manufacture evidence and offer it against a criminal defendant.'"   <u>Id.</u> at *8 (quoting <u>Stepp v. Mangold</u>, No. Civ. A. 94-2108, 1998 WL 309921, at *7 (E.D. Pa. June 10, 1998)).

The defendants argued that Doswell received a fair trial.   The court, however, disagreed. Construing the evidence of record in plaintiff's favor, the court found that there were genuine issues of material fact with respect to the fairness of the trial:

> While Ms. Tokar identified Doswell as her assailant, and no evidence in the record seems to support Doswell's allegation that Wolf engaged in suggestive conduct during his interactions with Ms. Tokar, other conduct by Wolf casts doubt on the fairness of trial.   For instance, Ms. Bolte has stated in an affidavit that Wolfe [sic] coerced and threatened her into identifying Doswell as the assailant, both before and during the trial.   Wolf also may have concealed from prosecutors, or affirmatively misrepresented to them, whether Doswell had an injury to his head at the time of his arrest, whether he was freshly shaven, whether he gave police a false alibi and whether he was pretending to have a debilitating neck injury at the time of the crime.   Absent this additional evidence against Doswell, all that would have remained for the criminal trial was Ms. Tokar's identification under possibly suggestive circumstances.   While the evidence before me does not conclusively establish Wolf's misconduct, it is sufficient to raise a genuine issue of material fact as to whether Doswell received the fair trial to which he was entitled under the Fourteenth Amendment.

Id. at *9.

The defendants argued that qualified immunity applied to shield their conduct, since they did not violate clearly established rights.   The court, operating within the Saucier v. Katz, 533 U.S. 194 (2001), framework,[1] first noted that it already determined that there are issues of fact whether the defendants violated Doswell's right to a fair trial.   It then analyzed whether the right was clearly established at the time of the alleged violation.

The court first addressed qualified immunity with respect to defendant Wolf.   The court held that the right to be free from "'falsifying documents, fabricating evidence, giving misleading or perjured testimony, and malicious prosecution'" was clearly established and that "'[i]t strains credibility to think that police officers could participate in the conduct alleged here

---

[1] In Part VI, the court explains this Saucier framework in detail.

and not understand that their actions violate the accused's rights.'"  Doswell II, 2009 WL

1734199, at *10 (quoting Crawford v. Pennsylvania, No. Civ.A. 1CV03-693, 2005 WL 2465863,

at *10 (M.D. Pa. Oct. 6, 2005)).

      The court addressed qualified immunity with respect to defendant City of Pittsburgh.

The court discussed the standard to be applied in determining whether municipal defendants can

be held liable under § 1983.  It noted that "'municipal liability only arises when a constitutional

deprivation results from an official custom or policy.'"  Doswell II, 2009 WL 1734199, at *11

(quoting Montgomery, 159 F.3d at 126).  Doswell's theory of liability was that the City of

Pittsburgh failed to train and supervise officers with respect to witness identification procedures,

criminal investigations, and preservation and disclosure of exculpatory evidence.  The court

explained that failures to train and supervise can form the basis of municipal liability in certain

situations:

> The "inadequacy of police training may serve as the basis for §
> 1983 liability 'only where the failure to train amounts to deliberate
> indifference to the rights of persons with whom the police come
> into contact.'"  [Beck v. City of Pittsburgh, 89 F.3d 966, 971-91
> (3d Cir. 1996) (quoting City of Canton v. Harris, 489 U.S. 378,
> 388, (1989))].  The plaintiff must show "both contemporaneous
> knowledge of the offending incident or knowledge of a prior
> pattern of similar incidents and circumstances under which the
> supervisor's actions or inaction could be found to have
> communicated a message of approval to the offending
> subordinate."  Montgomery, 159 F.3d at 127.  However, "[a] single
> constitutional violation can still provide the basis for municipal
> liability for failure to train, but only where the 'need for more or
> different training is so obvious and the inadequacy so likely to
> result in the violation of constitutional rights' that the
> policymakers inaction amounts to deliberate indifference.["]
> [Christopher v. Nestlerode, Nos. 05-3516, 05-3837, 2007 WL
> 1839822, at * 7 (3d Cir. June 28, 2007) (quoting City of Canton v.
> Harris, 489 U.S. 378, 391 (1989))].

Doswell II, 2009 WL 1734199, at *11.

The court determined that the case involved a situation in which the need for more training was obvious and that the failure to institute proper procedures amounted to deliberate indifference.  Viewing the evidence of record in Doswell's favor, Wolf only received formal training at the police academy with respect to traffic control; he did not receive any formal training with respect to detective work.  Wolf testified that he learned his job by "going out on the street and getting the school of hard knocks," and that he learned how to interrogate prisoners and how to conduct photo identification procedures from watching other detectives.  Id. at *12.  In relying primarily upon the report of an expert witness retained by plaintiff, the court also determined that evidence existed that showed the system of supervision and investigation of police misconduct was deficient.  Id.  The court concluded that plaintiff adduced sufficient evidence to survive the City of Pittsburgh's motion for summary judgment:

> Given the lack of training provided to police officers, including Wolf, and given the near complete lack of oversight of the actions and misconduct of police officers, I find that Doswell presented sufficient evidence from which a reasonable jury could conclude that the City of Pittsburgh acted with deliberate indifference with respect to the constitutional rights of its citizens, and that such indifference resulted in the injury to Doswell.  Accordingly, I deny the City's motion for summary judgment on this issue.

Id. at *13.

### III. Characterization of Plaintiff's Constitutional Claims

Before addressing the issues raised in the motion for summary judgment, it will be helpful to first characterize the constitutional claims set forth in count I.  Count I is entitled "42 U.S.C. § 1983 - Violations of Plaintiff's Civil Rights – Deprivation of Liberty Without Due Process of Law – Malicious Prosecution – and Denial of the Right to a Fair Trial," and under count I, it is alleged "[t]he criminal proceedings instituted by the Defendants herein were

undertaken maliciously, vengefully, and with bias, and are alleged to have violated Plaintiff's constitutional rights, deprived Plaintiff of a fair trial and of liberty without due process of law, and lacked probable cause. . . ." (Docket No. 1 ¶ 17.)   In Doswell, the court dealt with two separate § 1983 claims: malicious prosecution and denial of the right to a fair trial.  Doswell II, 2009 WL 1734199 at **5, 8.  Although this situation is not identical to Doswell, Whitley appears to assert those same two constitutional claims.   The court notes that plaintiff structured his memorandum of law in opposition to defendants' joint motion for summary judgment (Docket No. 74) first, to analyze the issues with respect to "Whitley's Federal and State Malicious Prosecution Claims," (Id. at 3), and second, to analyze the issues with respect to "Whitley's Fair Trial Claims."  (Id. at 13.)  The court considers count I to be asserting two constitutional claims under § 1983: malicious prosecution and denial of the right to a fair trial.

Malicious prosecution claims brought under § 1983 can be based upon either the Fourth Amendment or the Fourteenth Amendment procedural due process clause, but not under the Fourteenth Amendment substantive due process clause.  Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 792 (3d Cir. 2000).  Individuals are protected by the Fourth Amendment from malicious prosecutions that result in pretrial deprivations of liberty, and are protected by the Fourteenth Amendment procedural due process clause from malicious prosecutions that result in post-arrest deprivations of liberty.  See White v. Wilder, No. 2:07cv37KS-MTP, 2007 WL 3357315, at *3 n.1 (S.D. Miss. Nov. 7, 2007).

"The Fourteenth Amendment's guarantee of due process includes the right to a fair trial." Brown v. Wainwright, 459 F. Supp. 244, 246 (M.D. Fla. 1978).  The right of a criminal defendant to a fair trial is protected by the requirement that the prosecution disclose material exculpatory and impeachment evidence to the defense, as was established in Brady v. Maryland,

373 U.S. 83 (1963).  Although the due process protection recognized in <u>Brady</u> is the most

prominent guarantee of the right to a fair trial, "due process civil claims are not always strictly

limited by the criminal rules of the <u>Brady</u> framework."  <u>Rodriguez v. City of Houston</u>, No. H-06-

2650, 2007 WL 1189639, at *3 (S.D. Tex. Apr. 19, 2007).  Other protections encompassed by

the right to a fair trial include a right to a trial free from prejudicial and irrelevant evidence,

<u>Clark v. Duckworth</u>, 906 F.2d 1174, 1177 (7th Cir. 1990), and a right to an evidentiary

investigation that is not conducted in a shockingly reckless manner, <u>Amrine v. Brooks</u>, No. 04-

4300-CV-C-NKL, 2007 WL 436087, at *11 (W.D. Mo. Feb. 6, 2007).

With respect to plaintiff's claims of deprivations of the right to a fair trial, plaintiff argues

that defendants violated his rights to a fair trial by concealing evidence from plaintiff, falsifying

evidence during his prosecution, discriminatorily misusing interrogation techniques, and

deliberately ignoring exculpatory evidence.  Plaintiff argues that the right to a fair trial arises

under the Sixth and Fourteenth Amendments.   The court does not find plaintiff's claims to

implicate any rights secured by the Sixth Amendment, which provides that:

> In all criminal prosecutions, the accused shall enjoy the right to a
> speedy and public trial, by an impartial jury of the State and
> district wherein the crime shall have been committed, which
> district shall have been previously ascertained by law, and to be
> informed of the nature and cause of the accusation; to be
> confronted with the witnesses against him; to have compulsory
> process for obtaining witnesses in his favor; and to have the
> Assistance of Counsel for his defense.

U.S. CONST. amend. VI.  The court does conclude, however, that plaintiff's right to a fair trial

arises under the Fourteenth Amendment.

Although defendants seek summary judgment on the basis of the explicit source rule and

argue that plaintiff did not set forth any claims arising under the Fourteenth Amendment, the

court determines that plaintiff asserted a legitimate Fourteenth Amendment claim.[2]  In

Laughman v. Pennsylvania, No. 1:05-CV-1033, 2007 WL 2345295, at *8 (M.D. Pa. Aug. 16,

2007), the court determined a constitutional violation could arise from "doctoring evidence,"

which would be a violation of the substantive due process clause of the Fourteenth Amendment.

Other courts have held that alleged violations of the constitutional "right to be free from

falsifying documents, fabricating evidence, [and] giving misleading or perjured testimony" is

actionable under the due process clause of the Fourteenth Amendment, since these allegations

amount to a deprivation of "liberty without due process of law."  Crawford, at **9-10.  In

Crawford the court stated that this "makes out a due process claim in the most classic sense."  Id.

at *7.

        As recognized by the Court of Appeals for the First Circuit in Limone v. Condon, 372

F.3d 39 (1st Cir. 2004), "if any concept is fundamental to our American system of justice, it is

that those charged with upholding the law are prohibited from deliberately fabricating evidence

and framing individuals for crimes they did not commit."  Id. at 44-45.  The court of appeals

explained that "[a]ctions taken in contravention of this prohibition necessarily violate due

_____

[2] In their brief, defendants argue that plaintiff's claims are brought under the Fourth and
Fourteenth Amendments, and that the explicit source rule prohibits those claims to the extent
they are brought under the Fourteenth Amendment.  Plaintiff's claims asserting that he was
denied the right to a fair trial, however, are directly based upon the Fourteenth Amendment; the
claims are not based upon the Fourth Amendment.  The Court of Appeals for the Third Circuit in
Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995), specifically stated that §
1983 claims concerning an investigation cannot be based upon the Fourth Amendment:

> Indeed, for Fourth Amendment purposes, the issue is not whether
> the information on which police officers base their request for an
> arrest warrant resulted from a professionally executed
> investigation; rather, the issue is whether that information would
> warrant a reasonable person to believe that an offense has been or
> is being committed by the person to be arrested.

Id.

process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction)." Id. at 45.

In Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000), the Court of Appeals for the Second Circuit noted that "[t]he manufacture of false evidence, 'in and of itself,' . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right." Id. at 348. Rather, a constitutional claim cannot be limited to the act of falsifying evidence, but there also must be an attendant deprivation of liberty:

> But [the plaintiff]'s claim, though premised on the manufacture of false evidence, is not limited to that act. Rather, he alleges an example of a classic constitutional violation: the deprivation of his liberty without due process of law. The liberty deprivation is the eight months he was confined, from his bail revocation (after his arrest) to his acquittal, and the due process violation is the manufacture of false evidence. The complaint alleges that the deprivation of the liberty interest was the result of the due process violation.

Id.

In addition to fabrications of evidence, courts have held that reckless investigations can form the basis of a violation of the Fourteenth Amendment due process clause. In Hernandez v. City of El Paso, No. 08-222, 2009 WL 2096272, at *14 (W.D. Tex. July 9, 2009), the court stated "an official may be exposed to liability under § 1983 if he deliberately ignores exonerative evidence or conducts a reckless investigation." Id. at *14. In this case, based upon the rationales of the decisions analyzed above, the substantive due process clause of the Fourteenth Amendment provides the appropriate framework for analyzing plaintiff's § 1983 right to a fair trial claim.

**IV. Statute of Limitations**

42 U.S.C. § 1983 does not contain a statute of limitations.[3]  The federal courts look to state law to determine what statute of limitations will be applied in a § 1983 action.  Bougher v. Univ. of Pittsburgh, 882 F.2d 74, 78 (3d Cir. 1989); see Wilson v. Garcia, 471 U.S. 261, 268 (1985), superseded by statute on other grounds by 28 U.S.C. § 1658 ("The length of the limitation period . . . is to be governed by state law.").  All § 1983 claims should be treated as personal injury actions in order to determine the appropriate limitations period under state law. Bougher, 882 F.2d at 78; see Wilson v. Garcia, 471 U.S. at 272-76, 280.  In Pennsylvania, personal injury actions are subject to a two-year limitations period.  42 PA. CON. STAT. § 5524. The applicable statute of limitations for a § 1983 claim brought in the federal courts in Pennsylvania is two years.  Bougher, 882 F.2d at 78.[4]

Defendants argue that all constitutional claims plaintiff had against them are barred by the statute of limitations, since those claims accrued well outside of the two-year period.  The overt acts complained of in the complaint occurred on or about February 10, 1989, but the complaint was not filed until March 28, 2007.  (Compl. (Docket No. 1) ¶ 13.)

While federal courts apply state law statute of limitations in a § 1983 action, federal law determines when a claim accrues.  Montgomery, 159 F.3d at 126.  Defendants are correct in

---

[3] The header of the section of defendants' brief in support of the motion for summary judgment that concerns the statute of limitations reads: "The Complaint is barred by the applicable two-year statute of limitations."  (Docket No. 68 at 3.)  Defendants, however, apparently only challenge count I on this basis, and not the other counts.  The first sentence of the section reads "In Pennsylvania, the applicable statute of limitations for claims under 42 U.S.C. § 1983 is two years," and the argument in the brief only concerns the timeliness of the federal constitutional claims.  (Id.)  The court will only address the limitations period applicable to those claims asserted pursuant to 42 U.S.C. § 1983.

[4] The statute of limitations may be four years for claims arising under federal statutes enacted after 1990 that do not explicitly provide a statute of limitations.  See City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 124 n.5 (2005).

arguing that the statute of limitations for a § 1983 action begins to run from the time that a

plaintiff knows, or has reason to know, of any injury which is the basis of the action.  See id.  A

claim accrues upon awareness of an actual injury, not upon awareness that the injury constitutes

a legal wrong.  See Elliott Reihner Siedzikowski & Egan, P.C. v. Pa. Employees Benefit Trust

Fund, 161 F. Supp.2d 413, 421 (E.D. Pa. 2001).

Plaintiff argues that he did not sustain an injury with respect to the § 1983 claims until he

was exonerated, and he could not have been aware of any injury prior to the occurrence of the

actual injury.  With respect to his § 1983 malicious prosecution claim, plaintiff is correct.  The

Court Appeals for the Third Circuit faced a similar issue in Rose v. Bartle, 871 F.2d 331 (3d Cir.

1989), and held that the claim did not accrue until the plaintiffs obtained a favorable outcome:

> The plaintiffs maintain that because favorable termination was a
> necessary element of their section 1983 [malicious prosecution]
> claim, they neither knew nor had reason to know of the injury that
> constituted the basis of their actions until such termination, and
> that, accordingly, their section 1983 actions did not accrue under
> federal law until such termination.  We agree.  Because favorable
> termination is a necessary element of the relevant section 1983
> claim in this circuit, a holding that such termination need not have
> occurred for a plaintiff to be cognizable of his constitutional injury
> cannot be justified.

Id. at 349 (internal citation omitted).  This court agrees with the court's analysis in Doswell I that

Wallace v. Kato is not applicable to § 1983 malicious prosecution claims.  In Wallace, the

Supreme Court cited with approval its holding in Heck v. Humphrey, 512 U.S. 477 (1994), that,

for claims which have an element requiring the favorable termination of criminal proceedings,

the claim does not accrue until the termination.  Wallace, 549 U.S. at 392-93.  Favorable

termination is an element of plaintiff's malicious prosecution claim in this case.  See Part V.

Plaintiff's § 1983 malicious prosecution claim accrued on May 1, 2006, the date the state filed

and the court granted a petition for nolle prosse.  The lawsuit was filed on March 26, 2007,

within two years of the accrual date of plaintiff's claims.  Whitley's § 1983 malicious

prosecution claim is not barred by the statute of limitations.

A similar analysis applies to plaintiff's § 1983 denial of the right to a fair trial claim.

That claim likewise cannot be brought until there has been a favorable termination of the

proceedings.  In DiNicola v. DiPaolo, 945 F. Supp. 848 (W.D. Pa. 1996), the district court stated:

> ["]Requiring a section 1983 plaintiff to commence a federal
> action seeking damages for denial of his federal constitutional right
> to a fair trial prior to the final resolution of all state criminal
> charges against him would run contrary to well established
> principles of comity and federalism. If such an action were
> commenced, the federal district court would, in most cases, be
> compelled to abstain from ruling and stay the action pending final
> disposition in state court. Any other result would create the
> possibility of a ruling in conflict with the outcome in state court.["]
>
> . . . .
>
> ["]In Heck, the [United States Supreme C]ourt deemed the
> invalidation of a conviction or sentence to be the operative
> equivalent of a termination in the plaintiff's favor. . . . So as not to
> interfere with the state process, consistent with habeas exhaustion
> principles as elaborated upon in Heck, there must be finality–a
> termination of the criminal proceedings. Furthermore, the
> termination must be in "in favor of" the accused, at least in the
> sense that the charges have been dismissed and the defendant
> discharged. We therefore hold that there can be no civil action
> under § 1983 for denial of due process during trial for withholding
> exculpatory evidence unless and until the charges have been
> dismissed and the defendant discharged.["]

Id. at 860-61 (quoting Smith v. Holtz, 879 F. Supp. 435 (M.D. Pa. 1995)).  The court is

persuaded by the reasoning in DiNicola, and plaintiff's denial of the right to a fair trial claim is

not barred by the statute of limitations.  Since plaintiff's § 1983 claims raised in count I are not

time-barred, the court cannot grant defendants' motion for summary judgment on this basis.

**V. Malicious Prosecution Claims**

To be successful on a claim for malicious prosecution under Pennsylvania law, plaintiff must prove that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; and (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice.  Donahue v. Gavin, 280 F.3d 371, 379 (3d Cir. 2002) (citing Hilfirty v. Shipman, 91 F.3d 573, 579 (3d Cir. 1996)).  In addition to the state law elements of the tort, to succeed in a § 1983 claim for malicious prosecution, a plaintiff must also show a Fourth Amendment violation arising from an action occurring between arrest and trial.  Donahue, 280 F.3d at 381; see Johnson v. Knorr, 477 F.3d 75, 81-82 (3d Cir. 2007).

Defendants argue that plaintiff only adduced sufficient evidence to establish the first element of his malicious prosecution claims, and that evidence of all remaining elements is lacking.  Defendants primarily focus upon the second element: whether the 1989 charges were initiated without probable cause.  Defendants argue, inter alia, that plaintiff is barred by the doctrine of collateral estoppel from arguing whether probable cause existed.

Plaintiff's malicious prosecution claim here is based upon defendants' reckless action of "omitting crucial facts from the affidavit of probable cause for the arrest of Whitley while deliberately ignoring the panoply of evidence which exonerated Whitley in Malloy's murder." (Pl.'s Mem. of Law in Opp. (Docket No. 74) at 4.)  In response to the motion for summary judgment, plaintiff argues that "federal courts evaluating probable cause in § 1983 malicious prosecution actions have only recognized the limited applicability of collateral estoppel where a prior state court finding of probable cause rested on that state court's refusal to suppress evidence."  (Id. at 17 (citing Doswell II).)  Plaintiff argues that his malicious prosecution claim is

44

not predicated on the state court's decision to suppress evidence, but rather is predicated on the omission of facts from the affidavit of probable cause.

Although plaintiff argues <u>Doswell</u> is distinguishable, this court disagrees.  In <u>Doswell</u>, the malicious prosecution claim was "premised on what [Doswell] characterizes as an unduly suggestive photo array, and exculpatory evidence that was not provided to the judge."  <u>Doswell II</u>, 2009 WL 1734199, at *5.  In <u>Doswell</u>, the defendants argued that since the state courts determined that probable cause existed, collateral estoppel precluded Doswell from arguing that the criminal proceeding against him was initiated without probable cause.  The court agreed, holding that all elements of collateral estoppel were met.  <u>Id.</u> at *7.

Here, the malicious prosecution claims are premised on the omission of facts from the affidavit of probable case.  This situation is nearly identical to <u>Doswell</u>, namely, that exculpatory evidence was not provided to the judge.  Additionally, the omission of certain facts from the affidavit of probable case was the subject of a suppression motion filed by Whitley in the state court case.  The state court determined that there was no evidence of any false statements made knowingly, intentionally, or in reckless disregard of the truth, and denied the suppression motion because probable cause existed.

Collateral estoppel applies here.  The issues presented in the malicious prosecution claims with respect to probable cause are identical to the issue presented in the state court proceeding: whether omissions from the affidavit of probable cause invalidated the determination that probable cause exists to believe that Whitley committed the August 17, 1988 murder of Malloy.  The state court made a final ruling on the motion to suppress, denying the motion.  Plaintiff was a party in both actions.  Additionally, plaintiff had a full and fair opportunity to litigate the issue in state court.  Plaintiff does not argue that he was denied such an

45

opportunity.  Whitley's counsel cross-examined the state's witness, and declined to call any witnesses of his own.  Thus all elements of collateral estoppel are met.

Since plaintiff is barred by the doctrine of collateral estoppel from relitigating whether probable cause existed, plaintiff cannot establish the second element of his malicious prosecution claims.  Summary judgment must therefore be granted in favor of defendants with respect to count I to the extent plaintiff asserts a § 1983 malicious prosecution claim, and also with respect to count II, plaintiff's state law malicious prosecution claim.

**VI. Denial of the Right to a Fair Trial Claims**

The court already reviewed in depth in Part II.A. the relevant legal concepts with respect to plaintiff's § 1983 Fourteenth Amendment right to a fair trial claims.  It is clear that plaintiff's allegations, if proven, amount to a constitutional violation of the Fourteenth Amendment.

Defendants assert that summary judgment should be granted in their favor on plaintiff's § 1983 constitutional claims because they are entitled to qualified immunity.  The privilege of qualified immunity recognizes the balance between the need for a forum to vindicate the abuse of federal rights and the "substantial societal costs" entailed in opening government officials to suit for the discretionary exercise of their public duties.  Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982).  The United States Supreme Court resolved these competing concerns "by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  Anderson v. Creighton, 483 U.S. 635, 638 (1987); Acierno v. Cloutier, 40 F.3d 597, 615 (3d Cir.1994) ("[T]here is a

compelling need for such a protective doctrine because of the severe chilling effect numerous

suits for damages would have on prospective officials. . . .").

An objective inquiry is required into the reasonableness of the actions of government

officials that permits government officials to anticipate when their conduct may give rise to

liability for damages.  Anderson, 483 U.S. at 645-66.  The privilege affords "protection to all but

the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S.

335, 341 (1986). "Thus, law enforcement officials who 'reasonably but mistakenly' conclude

that their conduct comports with the requirements of the [Constitution] are entitled to immunity."

Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir. 1997), abrogated on other grounds by Curley v.

Klem, 499 F.3d 199, 209-10 (3d Cir. 2007) (quoting Hunter v. Bryant, 502 U.S. 224, 227

(1991)). When it attaches, the privilege of qualified immunity "is an immunity from suit rather

than a mere defense to liability" which is lost if defendants are permitted to go to trial.  Saucier

v. Katz, 533 U.S. 194, 200-01 (2001).  Once qualified immunity is asserted by a defendant, the

plaintiff has the burden of demonstrating the privilege should not attach.  McLaughlin v. Watson,

271 F.3d 566, 570 (3d Cir. 2001).  The inquiry into the claim of qualified immunity is distinct

from the inquiry into the merits of the claim.  Saucier, 533 U.S. at 197.

In Saucier, the Supreme Court developed a two-step analytical framework to test whether

a defendant is entitled to qualified immunity, but in Pearson v. Callahan, 129 S.Ct. 808, 818-22

(2009), it modified the Saucier analysis.  The Supreme Court overruled its prior decision in

Saucier, to the extent that it had *required* a federal court to determine the underlying merits of a

claim before determining whether the defendant in question was entitled to qualified immunity.

The Supreme Court made clear, however, that the sequence set forth in Saucier is often

beneficial, and that courts retain the discretion to employ it where appropriate.  Pearson, 129

S.Ct. at 818, 821-22.  In this case, the court will proceed in accordance with the Saucier framework.

Under this framework, the court first determines whether the facts, taken in a light most favorable to the plaintiff's allegations, show that the defendants' conduct violated a federal right or constituted a constitutional violation.  Saucier, 533 U.S. at 201. In determining this first step, the court should "set forth principles which will become the basis for a holding that a right is clearly established."  Id.

If a federal right would be violated based upon a plaintiff's allegations, the court moves to the next step: whether the federal right alleged to be violated was clearly established to a degree of particularity within the specific context of the case at issue.  Id.  A broad and generalized declaration that a clearly established federal right was violated is insufficient.  Anderson, 483 U.S. at 640.  For example, in Anderson, the Supreme Court determined that for purposes of applying the qualified immunity privilege, the simple assertion that the Fourth Amendment prohibits warrantless searches without probable cause and exigent circumstances was not enough to demonstrate that the defendants' conduct violated a "clearly established" right under the particular facts of that case.  Id. at 640-41.  Instead, the Court stated that, in order for a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Id.

If a rule requiring particularity was not in place, "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."  Id. at 639. The net effect would be to transform "a guarantee of immunity into a rule of pleading."  Id .  Thus, for the second prong of the framework, a right is "clearly established" where "it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.  The exact action in question, however, need not have been held unlawful, but, rather, "in light of the pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 639.  The officers must have received "fair warning" that their conduct was unconstitutional. Hope v. Pelzer, 536 U.S. 730, 740-41 (2002).

If the court determines that a review of the particular context demonstrates that the rights alleged to have been violated have been "clearly established," the court must decide "whether a reasonable official should have known that the alleged action violated the plaintiffs' rights." Doe v. County of Centre, Pa., 242 F.3d 437, 454 (3d Cir. 2001).

The Supreme Court of the United States instructs that determining whether a right was clearly established depends, in large degree, on the degree of particularity within the specific context of the case at issue.  See Saucier, 533 U.S. at 199-202. Other courts have noted that a public official is considered to have constructive knowledge of established law.  Cannon v. City & County of Denver, 998 F.2d 867, 874 n.6 (10th Cir. 1993). In addition, the Supreme Court has instructed lower courts to apply all precedents within their knowledge in deciding the issue of qualified immunity.  Elder v. Holloway, 510 U.S. 510 (1994).

**1. Whether an actionable violation of a federal right can be established**

The first step in the qualified immunity analysis is to determine whether an actionable violation of a federal right can be established in the first place.  Saucier, 533 U.S. at 201.  As noted above, plaintiff's § 1983 denial of the right to a fair trial claim is premised upon the concealment and falsification of evidence, the discriminatory misuse of interrogation techniques, and the ignorance of exculpatory evidence.  When responding to a motion for summary

judgment, the opposing party must go beyond the allegations in the pleadings and point to facts in the record.

The court first notes that the record does not contain evidence that was falsified by any defendant.  Plaintiff infers that defendants suborned perjury when Starr testified at Whitley's trial that he was not offered any incentive for testifying against Whitley.  Plaintiff relies upon two newspaper articles and a letter indicating that Starr's death sentence was reduced to a term of life imprisonment in exchange for his testimony.  The evidence plaintiff relies upon for the truth of the matters contained therein, however, is hearsay and cannot be considered by the court at this stage.  See Campbell v. City of New Kensington, No. 05-0467, 2009 WL 3166276, at *8 (W.D. Pa. Sept. 29, 2009) ("to the extent that Plaintiff relies on these articles for the truth of the matters contained therein, the newspaper articles are hearsay, and in some instances, hearsay within hearsay, and cannot be considered on a motion for summary judgment."); see also Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582, at *9 (W.D. Pa. Aug. 26, 2005) ("letters have been deemed inadmissible hearsay on a motion for summary judgment when offered as proof of the matter it asserted, or when not supported by an affidavit.").  Given the lack of admissible evidence of any fabrication or falsification by any defendant, plaintiff's § 1983 denial of the right to a fair trial claim depends upon the allegations of concealment, ignorance of evidence, and misuse of interrogation techniques.

For the deprivation of liberty that resulted from defendants' conduct to amount to a violation of due process, plaintiff must establish that defendants' behavior "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998).  As the Supreme Court explained in County of Sacramento v. Lewis, the conscience-shocking concept "duplicates no traditional category of

common-law fault, but rather points clearly away from liability, or clearly toward it, only at the

ends of the tort law's spectrum of culpability."  <u>Id.</u> at 848.  "At one end of the spectrum is

negligence, which is categorically insufficient to constitute conscience-shocking conduct for

purposes of the Due Process Clause."  <u>Taylor v. Altoona Area Sch. Dist.</u>, 513 F. Supp. 2d 540,

565 (W.D. Pa. 2007).  The Supreme Court has made it clear that the Due Process Clause does not

require a state to "guarantee due care on the part of its officials."  <u>Davidson v. Cannon</u>, 474 U.S.

344, 348 (1986).  At the opposite end of the spectrum is conduct intended to cause unwarranted

injury.  <u>Taylor</u>, 513 F. Supp. 2d at 565.  "[C]onduct intended to injure in some way unjustifiable

by any governmental interest is the sort of official action most likely to rise to the conscience-

shocking level."  <u>Lewis</u>, 523 U.S. at 849.  "Whether the point of the conscience-shocking is

reached when injuries are produced with culpability falling within the middle range, following

from something more than negligence but less than intentional conduct, such as recklessness or

gross negligence, is a matter for closer calls."  <u>Id.</u> (internal citation omitted).  Within this gray

area, universal rules do not apply; determinations must be made on a case-by-case basis:

> Rules of due process are not, however, subject to mechanical
> application in unfamiliar territory.  Deliberate indifference that
> shocks in one environment may not be so patently egregious in
> another, and our concern with preserving the constitutional
> proportions of substantive due process demands an exact analysis
> of circumstances before any abuse of power is condemned as
> conscience shocking.

<u>Id.</u> at 850.

There is no evidence of record that defendants' alleged constitutional violations were

committed deliberately or intentionally to injure plaintiff.  Plaintiff's claim of denial of the right

to a fair trial, therefore, falls within the close-call range above negligence and below intentional

conduct, and the specific facts of this situation must be analyzed.  Even though § 1983 claims

must be evaluated on a case-by-case basis, several decisions involving similar circumstances shed light on the analysis whether a genuine issue of material fact exists with respect to whether defendants' conduct violated the rights of plaintiff under the Fourteenth Amendment.

In Baker v. McCollan, 443 U.S. 137 (1979), the plaintiff's brother procured a duplicate of the plaintiff's driver's license.  The brother was arrested on narcotics charges in Potter County, Texas, and was booked and signed various documents as the plaintiff.  Bail was granted in the plaintiff's name, and, soon after, a warrant was issued for the arrest of the plaintiff.   Several months later on December 26, 1972, the plaintiff was pulled over for running a red light in Dallas, Texas.  Based upon the outstanding arrest warrant, the plaintiff was taken into custody. On December 30, 1972, Potter County deputies took custody of the plaintiff.  On January 2, 1973, Potter County officials compared a file photograph of the wanted man to the plaintiff, and determined that he did not match the person depicted.  The plaintiff was released that day.  Id. at 140-41.

The plaintiff sued the Potter County sheriff pursuant to § 1983, asserting violations of the Fourteenth Amendment.  The Court of Appeals for the Fifth Circuit held that a fact-finder could reasonably conclude that the sheriff acted unreasonably in failing to send identifying materials to Dallas or to compare him to the wanted man immediately upon the plaintiff's arrival in Potter County.   The Supreme Court disagreed.  It explained that whether plaintiff's incarceration was "wrongful" pursuant to tort-law concepts was irrelevant; the issue was whether plaintiff's incarceration was unconstitutional.  The conduct forming the basis of the alleged constitutional violation was the failure to investigate and determine that the wrong person was imprisoned.  Id. at 141-43.  The Supreme Court held that the plaintiff's allegations did not give rise to a claim under the United States Constitution:

> [The plaintiff]'s innocence of the charge contained in the warrant, while relevant to a tort claim of false imprisonment in most if not all jurisdictions, is largely irrelevant to his claim of deprivation of liberty without due process of law.  The Constitution does not guarantee that only the guilty will be arrested.  If it did, § 1983 would provide a cause of action for every defendant acquitted– indeed, for every suspect released. Nor are the manifold procedural protections afforded criminal defendants under the Bill of Rights "without limits."  [Patterson v. New York, 432 U.S. 197, 208, (1977).]  "Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person."  [Id.]

Baker, 443 U.S. at 144.

In Wilson v. Lawrence County, 260 F.3d 946 (8th Cir. 2001), the plaintiff brought an action against Lawrence County and several law enforcement officials, alleging they violated his constitutional rights in conducting a murder investigation.  The plaintiff was convicted for murder, and spent nine years in prison until the governor of Missouri, after conducting an independent investigation, granted the plaintiff a full pardon.  Id. at 949.

In Wilson, the killer broke into the victim's house, restrained and beat the victim, and started a fire in the house with the victim inside.  A major case squad was organized and began investigating the murder the next day.   During the days following the murder, the plaintiff was interviewed twice and he consistently stated he knew nothing about the crime.  Id.  The defendants learned that the plaintiff "was twenty years old, still lived at home, worked occasional odd-jobs, was mentally impaired, had attended mostly, if not exclusively, special education classes in high school and that some people believed he could be 'talked into anything.'"  Id.  An eyewitness saw someone outside the victim's house around the time of the fire, and the person the eyewitness saw was not the plaintiff.  Shortly before the murder a convicted felon, who had a modus operandi matching that of the murderer, escaped.  Id. at 955.

The investigation also focused upon another individual who knew the victim had been tied and beaten before that information was made public. This individual was "a junior in high school, involved in special education classes, and was slightly mentally impaired," and the defendants additionally knew he had disciplinary problems at his school and school officials described him as a "very skilled liar." Id. at 949. He eventually stated that the plaintiff confessed to the crime, and passed a polygraph test with respect to this issue. The examiner had difficulty, however, in interpreting the results of the polygraph test. Id. For the plaintiff's § 1983 action, this individual submitted an affidavit asserting that the defendants "tricked" him into giving information through leading questions, and they threatened to put him in jail if he did not implicate the plaintiff. The defendants challenged this account of the interrogations, but tapes of those sessions, which were supposed to be in the defendants' possession, disappeared. Id. at 950.

After being informed of the supposed confession, the defendants questioned the plaintiff during a four-hour interrogation session. The plaintiff initially denied any involvement in the murder, but later confessed to the crime under dubious circumstances:

> [A defendant] falsely told [the plaintiff] that he knew what [the plaintiff] was thinking because he had a psychiatrist analyze him and that they had an eyewitness who could put him at the scene of the crime before the fire. They began to ask [the plaintiff] leading questions about the murder, strongly rebuking and threatening him when he gave answers inconsistent with the facts of the crime or was unable to give an answer, and affirming him whenever his answers matched the details of the murder. Ultimately, a collection of discombobulated facts about the murder evolved into a confession. [The plaintiff] has stated that he only confessed because he was extremely scared, nervous, anxious, and was pressured to make a confession.

Id. No physical evidence linked the plaintiff to the crime. Id.

54

The plaintiff alleged that the defendants violated his Fourteenth Amendment due process rights by "recklessly or intentionally failing to pursue other leads in the investigation." Id.  With respect to this claim, the court first explained "[n]egligent failure to investigate other leads or suspects does not violate due process. Even allegations of gross negligence would not rise to the level of a constitutional violation.  The district court noted that only reckless or intentional failure to investigate other leads offends a defendant's due process rights." Id. at 955 (internal citations omitted).

The defendants argued that evidence of recklessness was insufficient to state a § 1983 claim with regard to an investigation, and that plaintiff instead must adduce evidence of intentional behavior.  The Court of Appeals for the Eighth Circuit disagreed.  It stated that "officers conducting the post-arrest investigation certainly had the luxury of unhurried judgments and repeated reflections, which make a reckless standard appropriate." Id. at 957.  The court elaborated that:

> Law enforcement officers, like prosecutors, have a responsibility to criminal defendants to conduct their investigations and prosecutions fairly as illustrated by the Brady line of cases requiring the state to disclose exculpatory evidence to the defense. Although charged with investigating and prosecuting the accused with "earnestness and vigor," officers must be faithful to the overriding interest that "justice shall be done." [United States v. Agurs, 427 U.S. 97, 110-11 (1976), overruled on other grounds, United States v. Bagley, 473 U.S. 667 (1985); see also Arizona v. Youngblood, 488 U.S. 51, 54-55 (1988)] (evaluating whether Brady applied where officers, rather than prosecutors, lost evidence). They are "'the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.'" [Agurs, 427 U.S. at 111 (quoting Berger v. United States, 295 U.S. 78, 88 (1935))]. There is no countervailing equally important governmental interest that would excuse the appellants from fulfilling their responsibility to investigate these leads when faced with an involuntary confession and no reliable corroborating evidence. Therefore, the proper standard to judge whether the officers' conduct violates due process is recklessness.

Id.

The defendants also challenged the sufficiency of the evidence of a reckless investigation.  The court of appeals affirmed the district court, which reasoned that if the plaintiff's "allegations about unlawful coercion are proved true, a reasonable factfinder could determine that Defendants recklessly or intentionally chose to force [the plaintiff] to confess instead of attempting to solve the murder through reliable but time consuming investigatory techniques designed to confirm their suspicions."  Id. at 956.

In Sanders v. English, 950 F.2d 1152 (5th Cir. 1992), a man on a bicycle robbed a person at gunpoint.  A police lieutenant was assigned the investigation of the case, and a sketch of the robber based upon descriptions provided by several people was circulated in a local newspaper. The lieutenant received a number of phone calls from individuals who said that the plaintiff resembled the sketch.  Three weeks after the robbery, the lieutenant did not arrange a line-up, but asked the victim of the robbery to come down to the courthouse and see if he could identify anyone in a packed courtroom.  The victim was asked whether he recognized anyone, and he stated the plaintiff's name.  The lieutenant within minutes obtained a warrant and arrested the plaintiff.  The plaintiff could not afford to post bond.  Id. at 1154-56.

After the arrest, the police lieutenant received information indicating he arrested the wrong person.  The day of the arrest, he learned that the plaintiff and the victim were related. The lieutenant did not find it peculiar that the victim knew the plaintiff by name and the two were related, yet the victim could not identify the plaintiff until three weeks after the robbery. The day after the arrest, one of the witnesses whose description of the robber was the basis for the sketch told the lieutenant that the plaintiff was not the robber.  The lieutenant did not speak with this witness, and declined to take any further investigative steps with respect to this

witness's statement.  The lieutenant also presented a photo array to all other witnesses, and none

of them identified the plaintiff as the robber.  One or two days after the arrest, the lieutenant

learned of an alibi that was corroborated by three credible witnesses, one of whom was a reserve

police officer.  The police lieutenant did not act on any of this information and did not bring it to

anyone's attention; he stated that he still believed the plaintiff was the robber, based upon the

victim's positive identification.  A grand jury declined to indict the plaintiff, and the court

dismissed the charges against him.  Id. at 1156-58.

One claim raised by the plaintiff was that the police lieutenant's actions subjected the

plaintiff to an illegal detention.  The Court of Appeals for the Fifth Circuit held that the plaintiff

adduced sufficient evidence that the police lieutenant knowingly and willfully ignored

substantial exculpatory evidence, and that this ignorance amounted to a constitutional violation:

> A fact-finder reasonably could conclude that [the police lieutenant]
> deliberately looked the other way in the face of exonerative
> evidence indicating that he had arrested the wrong man: three alibi
> witnesses deemed credible by [the police lieutenant], a negative
> identification by one of the witnesses who helped compose the
> police sketch, and a belated identification by the victim under
> peculiar circumstances.  [The police lieutenant]'s deliberate failure
> to disclose this undeniably credible and patently exculpatory
> evidence to the prosecuting attorney's office plainly exposes him to
> liability under § 1983.

Id. at 1162.  The court of appeals distinguished Baker, because the allegations were not that the

police lieutenant failed to take affirmative steps to investigate the innocence of the plaintiff, but

rather the lieutenant failed to release the plaintiff even after he knew or should have known that

the plaintiff was misidentified.

In Hernandez v. City of El Paso, No. 08-222, 2009 WL 2096272, at *1 (W.D. Tex. July

9, 2009), a homeless man was murdered in El Paso, Texas.  The next morning, the El Paso Police

Department began to gather evidence.  They visited several businesses in the vicinity of the

crime scene, and learned that gangs were responsible for graffiti on the back walls of a shopping

center.  Detectives examined the graffiti, and later learned that the plaintiff's alias matched a

name written in the graffiti.   The detectives searched the police department's records

management system, and realized that the plaintiff was previously arrested for attempted

shoplifting.  The detectives began drafting an affidavit to arrest the plaintiff for the homeless

man's murder.  The next day, the detectives returned to one of the businesses they previously

visited.  An employee there told the detectives that he witnessed the murder, and that the plaintiff

was an accomplice to the murderer.  This employee was taken to the police station, and identified

the murderer from a single photograph and identified the plaintiff as the accomplice from a

photographic line-up.  Arrest warrants were issued for the murderer and the plaintiff.  The

murderer eventually confessed to the crime, implicating himself and another person in the death

of the homeless man. The detective allegedly told the murderer he "could go free" if he named

his accomplice, and the murderer signed a statement naming the plaintiff as his accomplice.

Detectives arrested the plaintiff at his residence.  Id. at **1-4.

        The following day, a police officer received a call from a person asserting that his

neighbor confessed that he killed the homeless man.  Detectives brought the neighbor to the

police station.  His fingerprints matched a print found at the scene of the murder.  He was

interviewed, and maintained his innocence.  He stated he had been with the homeless man a few

days earlier.  Without performing any further investigation, the El Paso Police Department

concluded its investigation.  Id. at *5.

        The plaintiff was indicted, tried, and convicted for the homeless man's murder, and was

sentenced to ninety-nine years in prison.  After serving over twelve years in prison, the plaintiff's

conviction was overturned for ineffective assistance of counsel.  The charges against the plaintiff were dismissed.  Id.

The plaintiff brought a § 1983 claim against the City of El Paso and several police officers alleging various violations of his civil rights, including violations based upon the failure to investigate and the failure to develop exculpatory evidence.  In addressing these violations, the court stated:

> As a preliminary matter, the Court is mindful that there does not exist a cognizable tort claim for a police's negligent failure to investigate. [Sanders, 950 F.2d at 1161-62]; United States v. Martin, 615 F.2d 318, 329 (5th Cir.1980) (noting that negligence does not constitute a violation of a clearly established constitutional right).  In fact, once police establish probable cause, as here, the police are neither required to "investigate independently every claim of innocence," nor compelled "by the Constitution to perform an error-free investigation of such a claim."  [Baker, 443 U.S. 137, 145-46 (1979).]

Id. at *14.  The court concluded, however, that the plaintiff adduced sufficient evidence to establish a § 1983 "reckless investigation" claim.  The murderer testified that, when he saw the plaintiff for the first time, he told the defendants that he was not the accomplice.  The murderer testified that he later implicated the plaintiff, because the defendants promised to release the murderer if he identified the plaintiff as the accomplice.  The murderer also testified that his alleged confession statement was fabricated by one of the defendants who wrote the statement and then typed it.  Id. at **14-15.

This case appears similar to Wilson, Sanders, and Hernandez.  Although in Baker the court recognized that due process does not require state officials to take every imaginable step to eliminate the possibility of convicting an innocent person, Baker did not involve the constitutionality of an allegedly deficient evidentiary investigation.  The other three decisions

involved such investigations, and plaintiff's allegations are comparable to those raised by the plaintiffs in Wilson, Sanders, and Hernandez.

Viewing the evidence in plaintiff's favor here, a number of factors establish that defendants' actions amounted to more than mere negligence. Any factor standing alone would likely be insufficient to establish a constitutional violation, but, when the factors are viewed together, genuine issues of material fact exist.

One of the chief witnesses in the prosecution of plaintiff was Wilson. Wilson's identification of plaintiff as the murderer was suspicious, however, because, although Wilson gave a detailed description of the assailant the night of the murder, Wilson did not identify plaintiff until the next day, after Covington told authorities that Wilson revealed to him who the murderer was. This background is especially troubling given the close relationship between Wilson and Covington, and the type of weapon owned by Covington.

Whitley's fingerprints did not match those recovered from the crime scene, and Whitley did not have any scratches or marks on his body that would indicate he was recently in a physical struggle with someone.

Defendants were aware of other potential suspects. Mayes testified that Tench was in the vicinity of the McDonald's restaurant around the time of the murder, was wearing a trench coat similar to that worn by the murderer, owned a .25 caliber pistol, and had previously stolen a carton of Newport cigarettes. Although defendants believe they had Meador "alibied," Meador's alibi was contradicted by Bowden. Meador was not subjected to a polygraph examination, and was not made part of a line-up. His photo was not shown to any witness in a photo array, and his fingerprints were not tested.

Plaintiff argues that defendants engaged in a discriminatory misuse of investigative tools. For example, defendants showed Bufkin a photo array and asked Bufkin to pick out Whitley, but defendants did not show the photo array to the eight witnesses of the murder or to the seven who observed the individual searching in the area of the murderer's escape route within days of the killing.  Plaintiff argues that Torbin made up his own mind that Whitley committed the murder three days after the shooting.  Torbin stated that one reason he did not show a photo array or line-up to the people responsible for the seven reports was that Whitley was already in custody. Defendants tried searching for the murder weapon after Starr stated that Whitley admitted he threw the weapon over a hillside; defendants did not conduct a similar search after a number of individuals saw the person searching hedges days after the incident.

In light of all the facts within defendants' knowledge, the court believes a reasonable finder of fact could conclude that defendants acted recklessly in investigating the murder of Malloy, and that this reckless investigation was outrageous and rose to the level of a constitutional violation subjecting defendants to liability under § 1983.

### 2. Whether the violated right was clearly established

#### a. Individual defendants

The second step in the qualified immunity analysis is to determine whether the federal right violated was clearly established at the time of the violation.  Saucier v. Katz, 533 U.S. at 200.  The Court of Appeals for the Third Circuit recognized:

> The question we must address, of course, is not simply whether the behavior of the [defendants] "shocks the conscience" under the applicable standard, but whether a reasonable officer would have realized as much.  In this regard, "the salient question" we must ask is whether the law, as it existed [at the time of the alleged constitutional violation], gave the [defendants] "fair warning" that

> their actions were unconstitutional.  See [Hope v. Pelzer, 536 U.S.
> 730, 741 (2002)].  It is not necessary for the plaintiffs to identify a
> case presenting analogous factual circumstances, but they must
> show that the contours of the right at issue were "'sufficiently clear
> that a reasonable official would understand that what he is doing
> violates that right.'"  [Id. at 739 (citation omitted)].

Estate of Smith v. Marasco, 430 F.3d 140, 154 (3d Cir. 2005).  This court concludes, after

viewing the disputed facts in the light favorable to plaintiff, that the federal right at issue was not

clearly established at the time of the investigation, i.e. that it was a violation of the Constitution

for defendants to conduct recklessly the investigation of Malloy's murder.[5]  As explained in

Lewis, deliberately indifferent conduct may violate due process in certain circumstances, but not

in others.  Lewis, 523 U.S. at 847-50.  The parties did not cite any decisions issued prior to the

relevant actions of defendants that would have provided guidance with respect to whether

recklessness in the context of criminal evidentiary investigations violates due process.

The majority of the decisions cited by plaintiff in his brief with respect to whether the

right to a fair trial was clearly established do not concern a deficient investigation.  See, e.g.,

Miller v. Pate, 386 U.S. 1, 7 (1986) (concerning a conviction that was based upon the "knowing

use of false evidence"); United States v. Bagley, 473 U.S. 667, 676 (1985) (concerning a right to

a fair trial claim in which it was alleged that the prosecutor failed to disclose evidence that could

be used to impeach the government's witnesses).  The only decision cited in this part of

plaintiff's brief that concerns an investigation is Wilson, but Wilson was decided in 2001.  See

Wilson, 260 F.3d at 946.

---

[5] To the extent that plaintiff's right to a fair trial claim was based upon the falsification of
evidence, the court already determined that plaintiff did not adduce sufficient evidence to
establish that defendants falsified evidence.  The only issues with respect to the second prong of
the Saucier qualified immunity analysis, therefore, relate to the manner in which defendants
conducted the investigation and whether that investigation violated plaintiff's right to a fair trial.

Although the right to a fair trial was clearly established prior to the events that underlie this case, the contours of that right, at least to the extent that right relates to the level of care required in criminal investigations, were not clearly established.[6] <u>Sanders</u> was decided in 1992, and <u>Hernandez</u> in 2009.  As already mentioned, <u>Wilson</u> was decided in 2001.  The only relevant cited case prior to 1989 was <u>Baker</u>, decided in 1979, but that case did not concern an evidentiary investigation.  The court also believes a fair reading of <u>Baker</u> supports the conclusion that a reckless investigation *does not* implicate the right to a fair trial, since the court said "[d]ue process does not require that every conceivable step be taken . . . to eliminate the possibility of convicting an innocent person."  <u>Baker</u>, 443 U.S. at 144.  Because the parties did not identify any decisions issued prior to 1989 concerning whether a reckless investigation violated an accused's right to a fair trial, a reasonable officer in 1989 would not have fair warning that conducting a reckless investigation was unconstitutional.  Under these circumstances, individual defendants have qualified immunity and summary judgment must be granted in their favor with respect to plaintiff's § 1983 claims.

### b. Allegheny County

The United States Supreme Court in <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658, 694-95 (1978), held that a municipality or government entity can be found liable under § 1983 only when the municipality itself causes the constitutional violation. <u>City of Canton v. Harris</u>, 489 U.S. 378, 387 (1989); <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 244 (3d Cir. 2004).  The Court specifically recognized in <u>Monell</u> and <u>City of Canton</u>

---

[6] The court does not reach the issue whether it was clearly established prior to 1989 that the right to a fair trial is violated due to the knowing use of false evidence, since the court determined that plaintiff did not adduce sufficient evidence of the knowing use of false evidence.

that respondeat superior or vicarious liability will not attach under § 1983.  Id.  Under §1983, a government entity will be liable only when the "execution of the government's policy or custom . . . inflicts the injury. . . ."  Monell, 436 U.S. at 694.  District courts are instructed to evaluate claims for municipal liability "independently of the section 1983 claims against the [government employees]."  Carswell, 381 F.3d at 244 (quoting Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996); Fagan v. City of Vineland, 22 F.3d 1283, 1294 (3d Cir. 1994)).

This court, accordingly, must begin its inquiry in this case which alleges governmental liability under § 1983 by considering "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  City of Canton, 489 U.S. at 385. "A plaintiff must identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom police come into contact."  Carswell, 381 F.3d at 244 (citing City of Canton, 489 U.S. at 388).

The Supreme Court in City of Canton expressly rejected the notion advanced by a municipality that only unconstitutional policies are actionable under § 1983.  City of Canton, 489 U.S. at 388.  The Court held that a municipality, under § 1983, can be held liable for inadequate training of its employees.  Id.  "We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact."  Id.

Merely alleging that a training program for municipal employees is a policy of that municipality is not sufficient to implicate a constitutional issue.  Id. at 390.  This court, when an issue concerning a training program is raised, will need to determine: "whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy'."  Id.   In City of Canton the Court found that there

64

may be cases where the need for training or schooling is so obvious, and the lack of training so likely to result in constitutional violations, that it can reasonably be inferred that the municipality was deliberately indifferent to the need.  Id.  In those cases, the failure to train may be seen as a city policy "for which the city may be held liable if it actually causes injury."  Id.

Plaintiff's claim of liability against Allegheny County is premised upon "a policy of inadequately training and disciplining its police officers."  (Pl..'s Br. in Opp. at 29.)  Plaintiff's municipal liability claim fails, however, because the individual defendants did not violate a clearly established right.  "[A] claim for failure to train cannot be sustained unless the employees violated a clearly established federal constitutional right."  Young v. County of Fulton, 160 F.3d 899, 904 (2d Cir. 1998); see City of Los Angeles v. Heller, 475 U.S. 796, 798-99 (1986) (per curiam) ("neither [Monell] nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm"); Williams v. Borough of West Chester, 891 F.2d 458, 467 (3d Cir. 1989) ("[A municipality] cannot be vicariously liable under Monell unless one of [the municipality]'s employees is primarily liable under section 1983 itself.").  Summary judgment, therefore, must be granted in favor of Allegheny County with respect to plaintiff's § 1983 claims.

### Conclusion

After reviewing the undisputed material facts of record, viewing the disputed material facts of the record in favor of plaintiff, and drawing all reasonable inferences in plaintiff's favor, and for the reasons set forth above, the court determines that, although plaintiff's claims are not

barred by the statute of limitations, summary judgment must be granted in favor of defendants

with respect to counts I and II.

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Date: March 9, 2010